### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### TIDELANDS MARINE SERVICE, INC., Respondent.

No. 20743.

United States Court of Appeals
Fifth Circuit.

Nov. 11, 1964.

is in question here is whether the petition should be granted or denied. The Board's decision and order are reported at 140 NLRB 288 et seq.

The Board found that respondent violated Sec. 8(a) (1) by interrogation of employees concerning their union adherence, by expressions of retaliatory intent toward union supporters and by instructing supervisors to discharge union adherents. The Board further found that respondent violated both Secs. 8(a) (3) and 8(a) (1) by discharging thirteen employees because of their adherence to the union.

The primary question for decision here is whether the Board's findings of fact are supported by evidence when considered on the record as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

Respondent, recognizing that the burden is upon it to show that the Board's findings and order are not supported by evidence considered on the record as a whole, seeks by a labored and violent effort to impeach the integrity and impartiality of Examiner and Board and to discredit the Board's findings and order.

A careful consideration of the record shows that the attack is without basis in law and in fact and that the record clearly supports the findings and conclusions of Examiner and Board, and requires enforcement of the Board's order. This being so, it will serve no useful purpose for us to set out here the supporting evidence or to take up and discuss respondent's labored attacks upon Examiner and Board. It should be sufficient to refer to the Board's decision and order and to say that we agree with its findings, rulings, and conclusions, and direct the enforcement of its order.

In deference, however, to respondent's insistence that the order is without support in the particulars argued by it, we will briefly examine and discuss the facts in the light of the respective contentions.

Respondent services the offshore drilling rigs of Humble in the tidelands area

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Arthur M. Goldberg, N.L.R.B., Washington, D. C., Arnold Ordman, General Counsel, Elliott Moore, Attorney, N. L. R. B., for petitioner.

William A. Brown, Houston, Tex., Powell, Brown & Maverick, Houston, Tex., for respondent.

Before HUTCHESON, RIVES and BROWN, Circuit Judges.

HUTCHESON, Circuit Judge.

This is a petition for enforcement against respondent of an order of the National Labor Relations Board. What

of the Gulf by providing crews for vessels which serve as tenders for the rigs. A Board election was scheduled for mid-April, 1956, to determine whether respondent's employees wished to be represented by the Seafarers International Union or the National Maritime Union or neither.

In support of the Board's finding of facts constituting an 8(a) (1) violation, there is evidence that shortly before the election Cowan, a port captain in charge of respondent's operations, showed employee Murray a list of names and asked him to pick out the union supporters. When Murray replied that he couldn't do it, Cowan showed Murray his own name on the list and asked, "How does this name seem to hit you?" In reply, Murray claimed he was neutral. Cowan denied this conversation took place. Employee Dunn testified that prior to the election Cowan told him that if the union got in it would bring undesirables into respondent's vessels and asked him who was for the union. Dunn replied that Cowan had better ask the men. During the course of the election Cowan asked Murray and another employee not to "forget him when we go in there to vote". Cowan also told Dunn, while he was in line to vote, that he hoped he would vote right. Employee Gautreau testified that Cowan asked him whether certain employees had signed union pledge cards, to which he replied he didn't know about the others but he had signed. Two days later Cowan told him he had been replaced on the vessel because the vessel's supervisor and the tool pusher for the Humble rig serviced by the vessel did not want him there. Gautreau testified that the supervisor and tool pusher later told him they had not complained about his work, although the supervisor testified that he, and not Cowan, had fired Gautreau because he had not wired a switch properly. He further testified that Cowan had not told him to fire Gautreau. Shortly after the election Cowan told employee Dunn, "There are fifty-three [the number of votes cast for SIU] of you so-and-so fellows that are not good

company men, and I will get my revenge. * * * " Jackson, a vessel supervisor, testified that Cowan told him to find a way to get rid of certain employees, whom Cowan named, because of their support of the union. Although respondent argues that virtually all of these facts are untrue and points to contrary testimony from its witnesses, the Trial Examiner found them to be true, and the Board adopted his findings. In our opinion, there is sufficient evidence to support them.

In support of the Board's findings of facts to constitute an 8(a) (3) and 8(a) (1) violation as to discharge of employees, there is the following evidence.

(1) Discharge of employee Gautreau: The facts of his discharge were discussed above. The testimony is conflicting as to whether he was discharged for improperly wiring the switch or for his union support. The Trial Examiner and the Board credited Gautreau's testimony, and there seems to be substantial evidence, if believed, to support that theory.

(2) Discharge of Dunn, Murphy, Wagner and Stewart: There is testimony that following the election, which was set aside, Cowan told supervisor Jackson to find some pretext to discharge employees Dunn, Murphy, Stewart and Wagner because they were union supporters. Jackson discharged Dunn and Murphy, along with two non-union men purportedly for refusing to spray paint in an unventilated corridor unless they were provided with respirators. Cowan later countermanded the firing of the two non-union men but not Dunn and Murphy. He gave as his reason for the different treatment that the two non-union men had complained and come to him for redress, while the other two did not.

Wagner was discharged by supervisor Hatfield who testified that the reason was pressure from Cowan and that Hatfield considered Wagner one of his best men. The termination slip gave as Hatfield's reason simply, "I cannot use".

Stewart was discharged allegedly for spending too much time in the galley talking to another employee. Supervisor

Jackson testified that Cowan had told him to get rid of him one way or another, although Jackson had protested that Stewart was about the best man out there to do his work 'and that it would be hard to fine a reason to fire him.

(3) Layoff of vessel ST–4 crew: This crew of thirteen was laid off when the vessel went into drydock for repairs, although there was testimony that it was customary in such cases to bring a vessel out of drydock at the same time and switch the crew to it. When the ST–4 did leave drydock, another crew was switched to it from another vessel going into drydock in accord with the custom. This left most of the ST–4 crew laid off. Three of the crew were put to work but most never worked for the company again. This crew included two of the most active union organizers and most of the crew had signed union pledge cards. All but three of this crew were denied transfer to other vessels although there is evidence that the company policy was to allow such transfers. New men were hired during the time this crew was laid off, the company explaining that the old crew was not rehired because they had failed to keep in touch as instructed. The employees testified and produced letters from the company to the effect that they would be notified when work became available. The Trial Examiner and Board found the crew was discriminatorily laid off in violation of 8(a) (3) and (1).

The Board's order requires respondent to cease and desist from the unfair labor practices found, to reinstate the "discriminatees" with back pay, or, if positions are unavailable, to put them on preferential hiring lists, and to post an appropriate notice.

Respondent attacks the findings and order on the following grounds.

■ (1) The major part of respondent's argument is directed at discrediting testimony which the Trial Examiner and the Board decided to credit. It seems from the record that there is reason to doubt the truth of much of the testimony on both sides, and indeed the Trial Examiner seriously questioned the credibility of Jackson, one of the key witnesses in support of his findings, but finally decided to accept his testimony. However, it seems that this argument of respondent's raises only questions of credibility which this court has held are matters for determination by the trier of fact. N.L.R.B. v. Transport Clearings, Inc., 311 F.2d 519, 523; N.L.R.B. v. Ferguson, 5 Cir., 257 F.2d 88, 90.

■ (2) Respondent argues that the Trial Examiner erroneously applied the substantial evidence rule instead of the preponderance of the evidence rule. There was a Remand Hearing in which further evidence was developed and some evidence stricken from the record. It alleges that in writing his Supplemental Intermediate Report after the Remand Hearing, the Trial Examiner merely searched the record for substantial evidence to support his own prior decision instead of weighing all of the evidence in search of facts established by a preponderance of the evidence. Respondent's only support for this contention is that the Trial Examiner modified his original report rather than write a new one. We think it clear that this is not a sound basis for concluding that he applied a different standard in weighing the evidence.

(3) Respondent alleges that the Trial Examiner was prejudiced in the case and did not overcome this prejudice based upon much the same argument as point (2) above. It says that he made up his mind before the Remand Hearing and set about to sustain that decision in writing his Supplemental Report, ignoring new evidence developed in the hearing and still influenced by evidence stricken from the record there. There seems to be no real support for this theory except the fact that the Examiner modified his original report instead of writing a new one.

(4) Respondent argues that there is no evidence to support the findings of a discriminatory laying off of the ST–4 crew. The Trial Examiner found that

Respondent discriminated against four members of the ST-4 crew but not another four who did not communicate their availability for work to respondent after the layoff. The Board found that respondent discriminated against all eight of the men laid off because it would have been futile for them to contact Cowan under the circumstances of Cowan's previous threat to get revenge on those who were in favor of the union. Respondent points out that the Board's order recited only that Cowan knew of union membership of "most, if not all of the crew", and there is no direct evidence that he knew of union membership of the whole crew. He clearly did know some were union men and had good reason to believe that others were as well. Respondent argues that Cowan assigned ST-4 crewmen to available jobs without distinction as to union membership. In support of this contention it points out that three crewmen who were union supporters were given new work and one of those who was laid off was non-union. Respondent argues that the fifty-two new men that were hired while the ST-4 was in drydock were men who were standing by waiting for a job and were rush replacements on short notice. The ST-4 crew was not standing by but many of them had taken other jobs expecting to go out on the ST-4 when it left drydock. When the ST-4 went out it was to replace ST-5 and the ST-5 crew took it out. While it may be that the Board's position is weaker on the ST-4 crew layoff than as to others, we think it clear that there is substantial evidence to support the finding of discrimination.

■ (5) Respondent contends that the order should not be enforced because of changed conditions. The case arose in 1956, was heard in 1958, and again on remand in 1962, but the final Board order was entered in January, 1963. Conditions alleged to be changed include the volume of this type work available, change in supervisory personnel, including absence of Cowan, change in owner-ship of Respondent, change in staff of employees. However, the name of Respondent and the nature of its operations have not changed, and some personnel apparently remain who were there when the dispute arose. This is not a moot order.

The petition for enforcement should be, and it is hereby granted.