**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**McCORMICK STEEL CO., DIVISION OF DUCOMMON METALS & SUPPLY CO., Respondent.**

No. 24163.

United States Court of Appeals Fifth Circuit.

July 27, 1967.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Richard S. Rodin, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Elliott Moore, Atty., N. L. R. B., for petitioner.

James J. Loeffler, Houston, Tex., Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., of counsel, for respondent.

Before RIVES and DYER, Circuit Judges, and JOHNSON, District Judge.

DYER, Circuit Judge:

The petitioner, National Labor Relations Board, seeks enforcement of its order [1] finding that respondent McCormick Steel had violated § 8(a) (3) and (1) of the National Labor Relations Act [2] by discharging employee Springer because of his activities on behalf of the Steelworkers Union, and § 8(a) (1) [3] of the Act by interrogating employees about their union activities and by threatening employees because of their union activities.

This case is an outgrowth of an organizing campaign waged by the Union at respondent's warehouses in Houston, Dallas, Corpus Christi and Lubbock, Texas, and in Oklahoma City, Oklahoma. In September, 1964, McCormick's Houston employees secretly began plans to gain representation by the Steelworkers Union. At the suggestion of the union organizer, the over-the-road truck drivers, including Springer, spread the word to the other warehouses, gathered information necessary to establish all warehouses as a single bargaining unit, and handled the transportation of union authorization cards to and from the outlying warehouses. By November, 1964, some 75% of the employees had signed the authorization cards, and the company was notified by letter of this fact and that the Union wished to be recognized as their exclusive bargaining agent. McCormick rejected the Union's demand, and the Union then filed an election petition with the NLRB. After a hearing on the petition, an election was held which the Union won overwhelmingly.

In January, 1965, the Union filed the complaint which forms the basis for this action. We are presented with the questions whether substantial evidence on the record as a whole supports the Board's findings that Springer was discharged because of his union activity, and that the interrogation of employees interfered with, restrained or coerced them in the exercise of their § 7 [4] rights.

### I. The Section 8(a) (3) Charge

Bennie Springer was discharged in December, 1964, after being employed by McCormick for over sixteen years as an over-the-road truck driver. Prior to his discharge Springer had, with other drivers, elicited employee sentiment and information on working conditions from outlying warehouses, and had participated in transporting authorization cards for the Union. He signed up several employees personally. McCormick's testimony, which was discredited by the Trial Examiner and the Board, maintains that Springer was discharged for refusing to make a backhaul from Dallas on a return trip to Houston; that this was the last of a lengthy series of complaints against Springer for which he was duly warned; and that McCormick's supervisory personnel had no knowledge of Springer's union activity.

On the other hand, Springer's credited testimony shows that he was warned before his last trip to Dallas to be careful because his name had been mentioned in connection with the Union by a supervisor; that he had never been warned about the quality of his work; that he

---

1. 154 N.L.R.B. No. 122.

2. 29 U.S.C.A. § 158(a) (1), (3).

3. 29 U.S.C.A. § 158(a) (1).

4. 29 U.S.C.A. § 157.

was prepared to make the backhaul in question, but that when he requested that provision be made for help in unloading at the customer's plant the Dallas foreman said, "I don't like the way you talk to me. I got authority to fire you." The foreman then sent him back to Houston without the backhaul, saying he didn't care whether Springer "ever came back to Dallas." The following Monday, December 21, 1964, Springer was called into his superintendent's office where he was shown a letter from the Dallas division stating that he had refused to make the backhaul. Springer attempted to explain what had happened but was told "that ain't what this letter say," and he was peremptorily fired.

■■ The Board's decision must be sustained if supported by substantial evidence in the record as a whole. NLRB v. Brown, 1965, 380 U.S. 278, 291, 85 S. Ct. 980, 13 L.Ed.2d 839; Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Accepting that testimony credited by the Board as also we must, e.g., NLRB v. Tidelands Marine Service, 5 Cir. 1964, 338 F.2d 44, 45, 47, we conclude that there is substantial evidence in the record as a whole to support the facts found and reasonable inferences drawn by the Board of company knowledge of Springer's union activities and of anti-union animus in Springer's discharge.

II. The Section 8(a) (1) Charge

The Board's decision that McCormick violated § 8(a) (1) of the NLRA [5] is based on three incidents. According to employee Chavis, about one or two weeks after the representation hearing, held January 5, 1965, bay foreman Kimbro talked to Chavis about the Union:

He came up—he walked up to me about three or four o'clock that evening and he said, "Say, which way are you going to vote?" And I say, "I don't know." And I asked him which way he was going to vote and he say, "I can't; I'm a company man."

Nothing else was said.

Employee Smith testified that shortly after the same hearing Kimbro asked him about the Union:

Q. Would you describe that conversation to us? A. Well, he come up and asked me was I for the union and I told him I didn't know. And he went on to say what would happen if the union came in.

Q. What did he say? A. He said that more than half of the fellows wouldn't be qualified to take the—union tests, if the union came in. Therefore, if it did come in, we would be out of a job. And then he asked me again was I for the union after he said that, and I told him I didn't know.

Nothing else was said.

Employee Pearson testified about a conversation with foreman Manous in Dallas in late November, 1964:

* * * he said, "How you boys doing?" And I said, "Just fine." And he says, "There is a rumor out that they are trying to get the union in." So I laughed, and Sam [Brooks, another employee] said, "Not me." Just like that, and he said, "Well, have any of you ever worked in a union shop?" And I said, "I have. I worked in a union shop." And he described what the union could do for you and what they could not do for you, if you went on strike, how you would lose your job, the time you lost for your family, how much benefits you get from the profit sharing, and all that, and I just laughed at him.

Nothing else was said.

■ None of the above-quoted conversations contain any language threatening employer reprisals. For non-threatening conversations to be a violation of § 8(a) (1) fairly strict standards must be met including a showing that the circumstances of the interrogation would reasonably induce fear of reprisal and a showing of a background of employer discrimination. NLRB v. O. A. Fuller

5. See note 3 supra.

Super Markets, Inc., 5 Cir. 1967, 374 F. 2d 197.

■ Accepting the credibility findings of the Board, the circumstances of the three "interrogations" clearly show that each instance is isolated; each questioner was a man in daily contact with the employee and one with whom the employee would expect to have casual conversations. These few inquiries of so few employees, standing alone as they do here, are unimpressive to show or even imply a threat of reprisal.

■ Moreover, we fail to find anything in the record that reveals a background of employer discrimination. During the entire period of union organization and up to the time of the hearing only one employee had been discharged —Bennie Springer. One discharge under the circumstances here existing is not sufficient to create a background of discrimination. The paucity of evidence to support the 8(a) (1) violation charge, of course, means that the Board's decision cannot be sustained.

The petition of the Board for enforcement of its order is enforced as to the 8(a) (3) violation and is denied as to the 8(a) (1) charge.

Enforced in part and denied in part.