NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

ACME DIE CASTING CORPORATION,
Respondent.

No. 83–1310.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 17, 1984.
Decided March 2, 1984.

Sue Gunter, N.L.R.B., Washington, D.C., for petitioner.

Jeffrey W. Byrd, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for respondent.

Before CUMMINGS, Chief Judge, and WOOD and POSNER, Circuit Judges.

POSNER, Circuit Judge.

The Labor Board petitions us to enforce its order finding that Acme Die Casting Corporation violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (a)(3), by laying off two workers during a union organizing campaign, and that it violated section 8(a)(1) by questioning a worker about the union.

An organizing campaign at Acme's metal-die-casting plant in Northbrook, Illinois, a facility that employs some 120 to 150 nonsupervisory workers, began in July 1980. Two of the workers, Valenzuela and Reynosa, became active supporters of the union. Valenzuela distributed many union-authorization cards, and both he and Reynosa talked up the union to other workers. In September, two months before the representation election (which the union lost), they were both laid off. Reynosa was recalled shortly before the election, but Valenzuela never has been. They were the only workers laid off during the campaign. Valenzuela had worked for Acme for nine years, and there is no evidence he was ever disciplined. Reynosa had worked for Acme for less than a year, but there is no suggestion that his work was ever less than satisfactory or that there was a legitimate business reason to lay him off rather than some other worker.

The National Labor Relations Act does not require a company to give reasons for laying off a worker, even in the course of a union organizing campaign and even if the worker who is laid off is a union adherent. The company is only forbidden to lay off workers *because* they support the union. We thus have disapproved the drawing of an inference of improper motive from the fact that the employer is unable to give a good reason for firing or laying off a worker who happens to be a union supporter. *NLRB v. Loy Food Stores, Inc.*, 697 F.2d 798, 801 (7th Cir.1983). But where the only workers laid off in the course of a union organizing campaign are the union's leading adherents, as Valenzuela and Reynosa appear to have been, the coincidence may be too pat, and an inference of improper motive may arise. Cf. *NLRB v. Village IX, Inc.*, 723 F.2d 1360, 1367 (7th Cir.1983). The reasonableness of the inference in this case is enhanced by the fact that Valenzuela, the more active union adherent, was also "punished" more severely than Reynosa.

The company argues that it had no way of knowing who the union adherents were (and points out that the union, which may know, presumably will not tell). If this is right, the inference of improper motive would be rebutted. But the administrative law judge found, we cannot say unreasonably, that it is not right. He believed (as he was entitled to do) the testimony of Valenzuela and Reynosa that they carried out their union organizing activity openly; and it strains our credulity as it did his to suppose that Acme's management, which was hostile to unionization, could have missed what was going on under its nose. On one occasion Valenzuela spent an hour in the plant manager's office helping two new workers fill out their employment forms—and at the same time getting them to sign union authorization cards, a few feet in front of the manager. Valenzuela was laid off only a few hours after this incident—another suspicious coincidence.

The company presented evidence that Valenzuela was not really a very satisfactory worker, despite the company's failure to put in any evidence of his ever having been disciplined. But the administrative law judge disbelieved this evidence, and again we cannot say he was unreasonable to do so. He was also entitled to disbelieve the company's evidence that Valenzuela and Reynosa were laid off because demand for the plant's output declined during the relevant period, though the fact that Valenzuela had been on voluntary leave for 10½ out of the 35 weeks preceding his layoff provided some support for the company's contention. Although demand for the company's product did decline, the company adjusted by shortening the work shift from nine to eight hours rather than by shrinking its work force. Not only were

Valenzuela and Reynosa the only workers laid off, but the company continued hiring other workers, including two in the same job classification as Reynosa. And another worker was trained to take Valenzuela's place, contrary to Acme's claim that Valenzuela was redundant.

■ We conclude that the Board was entitled to find that Acme violated the Act by laying off Valenzuela and Reynosa—but not that it was entitled to find coercive interrogation. The "interrogation" consisted of a single question put to Valenzuela by his immediate supervisor while Valenzuela was in the plant manager's office in July 1980 on another matter: "Nicholas, do you know something about the Union?" To which Valenzuela replied, "I don't know." That was the end of the "interrogation." It was a month later that Valenzuela, in the same office, obtained signed authorization cards from two newly hired workers. The administrative law judge's entire analysis of the coercive-interrogation issue was as follows: "Stoner's [the supervisor's] inquiry to Valenzuela in July 1980 was patently coercive. *Continental Chemical Company,* 232 NLRB 705 (1977); *American Freightways Co. Inc.,* 124 NLRB 146 (1959)."

If this finding were in accordance with well established principles, we would affirm it despite its brevity; if a question has been settled, there is no need for the agency to expatiate upon it. But it is not. This is suggested by the administrative law judge's choice of cases to cite. *American Freightways* did not involve coercive interrogation, but threats; *Continental Chemical* is factually dissimilar to this case and contains no discussion of principles or standards that might bridge the gap. No one reading these cases could think they dictated the outcome in this one.

■ There is not, and in the nature of things cannot be, a mechanical formula for deciding whether a given interrogation is coercive, that is, likely to deter the interrogated worker (or others, who had heard about the interrogation) from supporting or (as here) working actively for the union. It would be untenable, as well as an insulting reflection on the American worker's cour-age and character, to assume that any question put to a worker by his supervisor about unions, whatever its nature and whatever the circumstances, has a tendency to intimidate, and thus to interfere with concerted activities in violation of section 8(a)(1). And untenable or not, this position has long been rejected by the Board as well as by the courts. See, e.g., *NLRB v. Village IX, Inc., supra,* 723 F.2d at 1369; *Blue Flash Express, Inc.,* 109 N.L.R.B. 591, 593 (1954). But once a per se rule is forsaken, the administrative and judicial inquiry is left somewhat at large, as in the analogous area of determining whether a confession is coerced and hence inadmissible in a criminal trial. See, e.g., *Haynes v. Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963).

■ In an effort to systematize the decision of coercive-interrogation cases, the courts, beginning with *Bourne v. NLRB,* 332 F.2d 47, 48 (2d Cir.1964), have identified a number of factors as relevant to deciding whether a particular inquiry is coercive, though we and other courts have made clear that these factors provide general guidance rather than a formula for decision. See, e.g., *First Lakewood Associates v. NLRB,* 582 F.2d 416, 419 (7th Cir.1978); *TRW, Inc. v. NLRB,* 654 F.2d 307, 314 (5th Cir.1981). The factors are the tone, duration, and purpose of the questioning, whether it is repeated, how many workers are involved, the setting, the interrogator's authority, the ambience of the questioning (has the company created an atmosphere of hostility to the union?), and, more doubtfully, whether the worker answers truthfully. Although the assumption is that an intimidated worker is more likely to lie, one can argue with equal plausibility that it is the meek who confess—that it requires a brazenness inconsistent with an inference of intimidation for a worker to lie to his supervisor. Moreover, it is worth noting here that although the administrative law judge found that Valenzuela had lied when he replied to the question whether he knew anything about the union, "I don't know," Valenzuela's primary language was Spanish and he may have misunderstood the question.

Even assuming that Valenzuela understood the question correctly and that a false answer is evidence of intimidation, it is not enough evidence to carry the day for the Board in this case, even in combination with the additional fact that the company manifested considerable hostility to the union—not only by (later) laying off Valenzuela and Reynosa in circumstances implying that this was done because they were the union's principal supporters, but also by making speeches to the workers that the Board found, not without reason, contained improper threats and promises, though these were not charged as separate violations of the Act. Offsetting these facts are many others. The "interrogation" was confined to a single question asked of a single worker, a question neither tendentious nor intimidating either in content or inflection, asked casually and in a friendly manner, and not followed up. Although the question was not asked in a social setting (the paradigm of the noncoercive inquiry, see, e.g., *NLRB v. Village IX, Inc., supra,* 723 F.2d at 1369), neither was it asked in the context of a worker's having been summoned to the manager's office to be questioned. And it was asked months before the company manifested any hostility to union activities. We do not think the questioning of Valenzuela could have intimidated either a worker of normal backbone, or this particular worker, whose subsequent boldness, culminating in his getting two workers to sign union authorization cards right in front of the plant manager, refutes any such inference.

It would have been better had Valenzuela's supervisor not asked him about the union; but unless questioning, however gratuitous, can fairly be deemed coercive, it cannot be made the basis for an unfair labor practice finding; and it was not coercive here. Although the literally thousands of reported Labor Board and court of appeals cases on coercive interrogation do not form an edifice of perfect symmetry, we are bolstered in our conclusion by a number of cases in which on similar facts the reviewing court rejected the Board's finding. See *Pioneer Natural Gas Co. v. NLRB,* 662 F.2d 408, 416 (5th Cir.1981); *TRW, Inc. v.*

*NLRB, supra,* 654 F.2d at 314–15; *Burns Electronic Security Services, Inc. v. NLRB,* 624 F.2d 403, 410–11 (2d Cir.1980); *Delco-Remy Division v. NLRB,* 596 F.2d 1295, 1309–11 (5th Cir.1979); *Central Hardware Co. v. NLRB,* 439 F.2d 1321, 1329 (8th Cir. 1971), vacated on other grounds, 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972); *NLRB v. Century Broadcasting Corp.,* 419 F.2d 771, 775, 780–81 (8th Cir.1969); *NLRB v. Welsh Industries, Inc.,* 385 F.2d 538, 540 (6th Cir.1967); *NLRB v. McCormick Steel Co.,* 381 F.2d 88, 90–91 (5th Cir.1967); *NLRB v. O.A. Fuller Super Markets, Inc.,* 374 F.2d 197, 203 (5th Cir.1967), and especially *NLRB v. Hotel Conquistador, Inc.,* 398 F.2d 430, 431, 434 (9th Cir.1968), which involved an interrogation almost identical to that in the present case. But see *NLRB v. Elias Bros. Big Boy, Inc.,* 325 F.2d 360, 364 (6th Cir.1963).

The Board's order is enforced in part and denied enforcement in part, in accordance with our opinion.