**SMITHS INDUSTRIES, INC.,**
Petitioner/Cross–
Respondent,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent/Cross–
Petitioner.**

Nos. 95–5400, 95–5484.

United States Court of Appeals,
Sixth Circuit.

Argued May 2, 1996.

Decided June 11, 1996.

Peter J. Kok (argued and briefed), David M. Buday (briefed), Miller, Johnson, Snell & Cumminskey, Grand Rapids, MI, for petitioner.

Aileen A. Armstrong, Deputy Associate Gen. Counsel, Frederick C. Havard (argued and briefed), Lisa Richardson Shearin (briefed), N.L.R.B., Washington, DC, for respondent.

Before: GUY, NELSON, and BATCHELDER, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

The petitioner, Smiths Industries, was found guilty of unfair labor practices in violation of §§ 8(a)(1), (3) and (5) of the NLRA, 29 U.S.C. §§ 158(a)(1), (3) and (5). Our review of the record convinces us that the Board's final order affirming the decision of the administrative law judge finding Smiths in violation is not supported by substantial evidence, and we reverse and deny the Board's application for enforcement of its order.

## I.

Smiths Industries is an aerospace company that manufactures computerized guidance systems for aircraft. In February 1994, Harold Mitchner, a supervisor employed by Smiths Industries, instructed some of the workers under his supervision to move certain product on which they had finished working to another department for further processing. One of the employees complained about this assignment, indicating that he felt that this was not unit work and was work that should be done by a different group of employees known as luggers. As a result of this complaint, the union steward, Donald Dekker, went to Mitchner to discuss this matter and Mitchner explained to Dekker that this type of work assignment was specifically permitted under a letter of agreement, dated July 13, 1993, between the union and the company. Dekker indicated he

would make further inquiry, and later that day came back and told Mitchner that there appeared to be no problem. Mitchner, at this point, showed Dekker the lugger agreement, which provided in pertinent part that

in order to reduce cycle time, and in an effort to eliminate the misrouting of product, the company and union agree:

Employees may move product, under the direction of the supervisor, between adjacent departments within the manufacturing building.

Mitchner heard nothing further from anyone on this matter until March 7, 1994. On this date, Dekker approached Mitchner and told him he intended—on his own behalf—to grieve the directive to move product to adjacent departments. Since Dekker was the union steward, this verbal notification to his supervisor actually constituted the first step in the contractual grievance process. The grievance was verbally denied by Mitchner.

On March 10, 1994, Dekker again approached Mitchner relative to the grievance and announced he was going to the union office to investigate the lugger grievance. Mitchner instructed Dekker that he was not allowed to go to the union office for that purpose. Mitchner's response to Dekker was predicated upon a provision of the collective bargaining agreement that restricted access by stewards to the union office in the plant to those occasions when their presence was requested by a committeeman. Mitchner went on to tell Dekker that since his grievance had been denied verbally, he was now at the next step in the grievance process, which involved putting the grievance in writing, and that he could go back to his work station and either write out the grievance or go back to work.

There is no dispute that union stewards such as Dekker are allowed up to two hours a day on company time to process grievances. Mitchner also told Dekker that if he believed Mitchner was wrongfully denying him access to the union office at that time, then the appropriate response would be for Dekker to challenge this refusal by filing a grievance.

In an excess of caution, Mitchner later that day met with labor relations manager, Harry Townshend, and related to Townshend what had been occurring between Mitchner and Dekker. Townshend confirmed that the steward's right to go to the union office during working hours was contingent upon a committeeman requesting his presence, and agreed that Mitchner had handled the matter properly. Townshend further told Mitchner that, in the event this did not end the matter and Dekker disobeyed a direct order not to go to the union office during working hours, he should be cited under the appropriate shop rule for insubordination and that disciplinary action should follow.

Although Dekker did not press the matter further with Mitchner on March 10, the next day he again told Mitchner that he was going to the union office relative to his lugger grievance. Mitchner essentially responded that they had discussed all of this on the previous day and that his instructions to Dekker were the same—go back to your work station and write up the grievance or go to work. Mitchner also reiterated to Dekker that, if he felt this action on Mitchner's part was not in keeping with the collective bargaining agreement, he had a right to file a grievance. At this point in the discussion it became clear to Mitchner that Dekker was not going to obey his order and Mitchner asked another employee to come over and listen while Mitchner again ordered Dekker not to go to the union office and to write up his grievance at his work station. Dekker disobeyed the order and walked in the direction of the union office. Both Mitchner and the other employee followed Dekker to where the time cards were kept where Dekker was making the required notation on his time card indicating he was now on union business. Mitchner again implored Dekker to return to his work station, but Dekker ignored the directive.

Approximately one hour later, Dekker returned to Mitchner's office. At this time Mitchner contacted the union committeeman, Ken Dykhuis, and a company representative, Tom Sanders, to meet and discuss what had occurred. Mitchner also again discussed this matter with Townshend. When all the par-

ties were assembled, Mitchner explained what had happened and then allowed Dykhuis and Dekker an opportunity to present their side of the story. Dekker freely admitted that he had been ordered not to go to the union office, and that he had disobeyed this order. The meeting ended by Mitchner informing Dykhuis and Dekker that Dekker was suspended for three days, which was the first disciplinary step under the company's progressive discipline system.

On March 16, 1994, Local 330, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO (UAW), filed charges with the National Labor Relations Board alleging that Smiths Industries had violated sections 8(a)(1), (3) and (5) of the NLRA by refusing to allow Dekker to process grievances on union time, limiting Dekker's grievance filing activity to before or after work or on break time, refusing to grant Dekker access to "union time," and suspending Dekker because of his grievance filing activities.

A hearing was held before an ALJ at which the ALJ concluded that Smiths Industries had violated sections 8(a)(1), (3) and (5) of the NLRA. The Board affirmed the ALJ, and this decision became the final order of the Board. Smiths Industries subsequently filed a timely petition for review of the Board's order, and the Board then filed a cross-application for enforcement of its order.

## II.

■ We review decisions of the NLRB under a substantial evidence standard, however, we are not bound by the Board's conclusions of law, which receive de novo review. *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 368 (6th Cir.1993). In concluding that the company had committed an unfair labor practice, the Board found that Smiths Industries had made unilateral changes in the terms and conditions of employment without first negotiating these changes with the

UAW. To put this finding in proper perspective, it is necessary to first look at the relevant contract language. The collective bargaining agreement provides:

> The Company will provide space, telephone, and furnishings for a Union Work Center (office) within the Plant for authorized personnel only (Shop Committee and President), the only exception would be when a Committeeman requests Stewards or employees to investigate a grievance. The Committeeman will make this request through the Stewards' or employees' Supervisor, advising the Supervisor of the specific grievance.

This language was added to the contract in 1984 as a result of abuses that were occurring with regard to the use of the union office and union personnel spending time in the union office.[1] Despite this language, the ALJ found that the company had a long established practice of allowing stewards to visit the union office on union business without being requested to come to the office by their committeeman. The Board, in reviewing the ALJ's finding, concluded that this practice had become an implied term and condition of employment, even though the practice " 'constituted a deviation from the letter of the parties' ... agreement.' "

Although there was record support for the Board's conclusion that there was a prior past practice of allowing union stewards to go to the union office without being requested to do so, we nonetheless reject the Board's legal conclusion relative to the effect of this past practice.

■ The language of the collective bargaining agreement defines the status quo for purposes of determining whether a unilateral change has been made. *Intermountain Rural Elec. Ass'n v. NLRB*, 984 F.2d 1562, 1567 (10th Cir.1993); *see also NLRB v. Frontier Homes Corp.*, 371 F.2d 974, 980 (8th Cir. 1967) (if contract had been in force at time of layoff, employer would have been justified in following its terms, even though it differed

---

1. At the time that this dispute arose, the collective bargaining agreement between Smiths Industries and Local 330 had expired. The parties had reached impasse, and Smiths Industries had unilaterally reinstituted the prior contract with

the exception of the arbitration provisions that were part of the grievance process. No one contests that the contract language above quoted was in force at the time that Dekker was disciplined.

from established past practices). Once a collective bargaining agreement has expired, past practices, even those contrary to the letter of the expired agreement, may represent the existing status quo. *Sacramento Union*, 258 N.L.R.B. 1074, 1075 (1981) (regularly observed priority list system for job assignments is an implied term and therefore a mandatory subject of bargaining, even though the "practice[ ] may have constituted a deviation from the letter of the parties' expired agreement"). Upon impasse, however, an employer may unilaterally change established practices. *Borden, Inc. v. NLRB*, 19 F.3d 502, 512 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994); *see also Sacramento Union*, 258 NLRB at 1075 (a unilateral change adopted after impasse consistent with an employer's final offer is not a violation of section 8(a)(1) and (5)).

■ In this case, following expiration of the collective bargaining agreement, the parties negotiated to impasse. At that point, Smiths Industries made its final offer containing the language of the previous agreement restricting access to the union office. This dispute arose after implementation of Smiths Industries' final offer and therefore past practices were no longer controlling. The decisions that the Board cites in support of its holding on this issue are all distinguishable, either because they involve past practices that do not conflict with plain and unambiguous contract language or they involve a situation in which there was no agreement in effect between the parties. In the case at bar, the parties had reached impasse, and Smiths Industries had implemented its final offer that included the controlling language contained in article XII, section 3, paragraph 7 of the collective bargaining agreement.

The principal fault we find with the Board's holding in this regard, however, is that the authority upon which the Board relies does not involve a situation in which an employee has intentionally disobeyed a specific command of a supervisor. If without talking to Mitchner, Dekker had simply gone to the union office on union business and then was disciplined when Mitchner found out about it, the situation might be different.

Under such a circumstance it might be reasonable to conclude that the shop steward, based upon past practice, could have reasonably assumed that he could go to the union office. Here, however, Mitchner in no uncertain terms made it clear to Dekker, who was familiar with the provisions of the collective bargaining agreement, that Mitchner intended to hew to the directive contained in article XII.

Since there is little or no dispute between the parties as to the facts, we conclude that the Board made an error of law when it found that Smiths Industries had violated sections 8(a)(1) and (5) of the NLRA by making a unilateral change in the terms and conditions of employment.

### III.

■ The Board also concluded that Smiths Industries had violated section 8(a)(3), which provides that it is an unfair labor practice for an employer to discriminate with regard to the terms or conditions of employment by discouraging membership in unions or union activities. The Board's conclusion is bottomed on a finding that when Dekker went to the union office he was engaging in the protected activity of processing a grievance and, accordingly, could not be disciplined for his conduct. This holding is bottomed on a misconstruction of what occurred here. The Board treats this as if Dekker had been given a general order that he could not process grievances on company time. If such an order had been given, it would clearly be contrary to the agreement of the parties and would interfere with protected union activity. Dekker's own testimony before the ALJ shows conclusively that Dekker had never experienced any general interference with his processing of grievances nor had he been refused permission to do so on company time.

The only grievance being discussed here is the one that Dekker filed on his own behalf. It related to a matter that had been under discussion for over a month and about which Dekker had already had discussions with the union committeeman. As evidenced by the written grievance that was ultimately filed, the grievance involved no complicated facts

or issues and could have been easily composed by Dekker at his work station in a matter of minutes. The only order that was issued here by Mitchner was that pursuant to the relevant proviso in the collective bargaining agreement, Dekker was not to go to the union office without being called there by his committeeman. To conclude from that directive that there was somehow general interference with Dekker's ability to process grievances is a stretch totally unsupported by the record.

In addition, in order to find a section 8(a)(3) violation, it is necessary for the Board to find that the complained of action on behalf of the employer was motivated by anti-union animus. Here also we find the Board's conclusion that there was anti-union animus present to be unsupported by the record. Dekker himself testified that historically he had never had any problems with Mitchner or anyone else regarding the processing and filing of grievances. The Board's suggestion that Mitchner was motivated in his refusal to allow Dekker to go to the union office by a personal feeling that the grievance had no merit, even if true, would not indicate an anti-union animus under the totality of the circumstances presented here. Reasonably believing that the issue of who was to transport product from one department to another had been settled a month earlier, it is understandable that Mitchner was both somewhat surprised and perturbed by the fact that a grievance was now being filed. At no time, however, did he ever dispute the right of Dekker to file such a grievance or to stand in the way of his filing such a grievance. Prohibiting the trip to the union office, in our view, is not related to Dekker's ability to file an appropriate grievance. Indeed, a grievance was ultimately filed on this issue.

Our view of the record is that there is no evidence, substantial or otherwise, supporting the Board's conclusion that Dekker was disciplined because of his efforts to file a legitimate grievance. He was clearly and appropriately disciplined for insubordination. Although historically other shop stewards had gone to the union office without being summoned by a committeeman, none had done so in the face of a direct order of a supervisor not to go. The facts here are clearly distinguishable from the situation in which other stewards went to the union office without seeking permission or perhaps without even the knowledge of their supervisor.

The decision of the Board is **REVERSED** and the request for enforcement of the Board's order is **DENIED**.