**TEL DATA CORPORATION, Petitioner, Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.**

Nos. 94–6490, 94–6576.

United States Court of Appeals, Sixth Circuit.

Argued March 29, 1996.

Decided July 31, 1996.

Charles Hampton White (argued and briefed), Cornelius & Collins, Nashville, TN, for Tel Data Corp.

Daniel J. Michalski (argued), National Labor Relations Board, Office of General Counsel, Washington, DC, Aileen A. Armstrong, Deputy Associate General Counsel, Deborah E. Shrager (briefed), National Labor Relations Board, Appellate Court Branch, Washington, DC, Margaret Gaines Neigus (briefed), National Labor Relations Board, Washington, DC, for National Labor Relations Board.

Before: KENNEDY, WELLFORD, and MOORE, Circuit Judges.

WELLFORD, Circuit Judge.

We review an employer challenge to a decision by the National Labor Relations Board ("the Board") and the latter's application for summary enforcement of its orders. Petitioner attacks only a portion of the order, raising several issues: 1) whether the Board erred in ruling that it fired employee Dale Frederick in violation of §§ 8(a)(1) and (3) of the National Labor Relations Act ("the Act"); 2) whether the Board erred in finding that Frederick is entitled to reinstatement and full backpay in connection with his unlawful discharge; and 3) whether the Board erred in ruling that the employer fired Sherry Scott in violation of §§ 8(a)(1) and (5) of the Act. See 29 U.S.C.A. §§ 158(a)(1), (3) & (5) (West 1973). We **AFFIRM** in part and **REVERSE** in part.

Tel Data Corporation ("Tel Data") is in the business of installing electronic communication systems in retail stores nationwide. For a number of years, the company has negotiated a series of collective bargaining agreements with the Communications Workers of America ("the union"). In October, 1991, Tel Data employee Dale Frederick obtained a copy of the current collective bargaining agreement ("CBA") from union president Jesse Parrish. Frederick concluded that Tel Data was not complying with all of the CBA's terms. Thereafter, Frederick spoke with a number of other employees about his concerns. Eventually, he relayed these concerns to Parrish who requested a grievance meeting, held on November 1, 1991. Tel Data thereupon agreed to honor the CBA, and no further action was taken on the grievance.

On November 12, 1991, however, Tel Data changed its practice regarding employee use of corporate telephone credit cards. In the past, employees had been told that they could charge up to forty dollars per month of personal calls without reimbursing Tel Data. Under the new procedure, employees were forbidden from using the phone cards for personal calls, but, as provided in the CBA, out-of-town employees could claim an allowance of six dollars per week for such calls. Tel Data had granted its employees special privileges in the use of credit card calls and returned to the CBA basis.

On November 19, 1991, Tel Data issued a memorandum regarding the use of company vans by out-of-town employees during off-work hours. This memorandum provided, in pertinent part:

> Employees can drive company vans a reasonable distance from job sites for meals, shopping for necessities, etc. and, of course, to hotels/motels for lodging purposes. A reasonable distance depends on many factors including, but not limited to, the size of the city where work is ongoing, availability of lodging, restaurants, etc. Reasonable judgment is to be exercised, and when in doubt the employee is to seek approval from his supervisor on what the company considers reasonable.
>
> . . . .
>
> Any use of company vans other than those covered in this policy require [sic] approval in advance by the employee's supervisor for each and every time an exception to this policy is permitted.

On December 13, 1991, Tel Data held a meeting of employees at its headquarters in Nashville, Tennessee, at which Tel Data's president, John Griffin, announced that he

knew that at least eight employees had contacted the union. He added that "since all this union crap has come up," there were going to be some changes, warning employees that they could not have it both ways— requiring Tel Data to adhere to all particulars of the CBA, yet expecting special benefits that Tel Data had been providing beyond the CBA requirements.[1] Griffin also made threats to fire all the employees, close Tel Data, and reopen under another name.

Employee Sherry Scott was fired on November 25, 1991, for violating Tel Data's van policy after using a Tel Data van to go on an extended trip from Florida to Myrtle Beach, South Carolina, and then on to Louisiana without Tel Data's approval. In January 1992, Frederick, a nine-year employee, was reprimanded and eventually fired for charging an excessive amount of personal calls in violation of Tel Data's phone credit card policy. We consider the facts concerning these employees separately.

Unfair labor practice charges were filed against Tel Data, following the discharges of Scott and Frederick. On March 4, 1994, Administrative Law Judge ("ALJ") Richard Scully concluded that Tel Data had engaged in specified violations of § 8(a) of the National Labor Relations Act.[2] The ALJ decided: 1) that Tel Data violated §§ 8(a)(1) and (5) of the Act by implementing material and substantial changes in its policy regarding use of Tel Data's telephone credit cards for personal calls in retaliation against employees for engaging in protected activity and without first providing notice to the union with an opportunity for bargaining; 2) that Tel Data violated §§ 8(a)(1) and (3) of the Act by discharging Dale Frederick in retaliation for engaging in protected activity; 3) that Tel

Data violated §§ 8(a)(1) and (5) of the Act by firing Frederick for allegedly violating its unlawful policy concerning use of Tel Data's phone cards for personal calls; 4) that implementation of Tel Data's November 19 van policy did not violate the Act, because it did not constitute a change from Tel Data's prior unwritten policy regarding the use of Tel Data vans by out-of-town employees during off-work hours; and 5) that the termination of Sherry Scott was not motivated by union animus and thus did not violate the Act.

On October 27, 1994, the Board affirmed the first three ALJ rulings, but disregarded the last two concerning Tel Data's van policy and the discharge of Scott. The Board ruled that the November 19 van policy was a unilateral change from existing Tel Data policy in violation of § 8(a)(1) and (5) of the Act, stating:

> Prior to this policy, there was never a requirement that employees obtain the advance approval of their supervisor to use company vans on their nonworktime, including trips beyond a "reasonable distance" from their jobsites. Indeed, [Tel Data] had never communicated any restrictions to employees and, as the judge noted, maintained an unspoken "don't ask, don't tell" policy. The record shows that no employee had ever been denied the use of a van based on the "reasonable distance" limitation, even when [Tel Data] was aware that the employee would be driving the van a substantial distance from the jobsite.

Further, the Board found that this policy change was instituted in retaliation against employees for engaging in protected activity in violation of §§ 8(a)(1), (3) and (5) of the Act. Finally, the Board ruled that Scott's

---

1. After this meeting, employees were issued, for the first time, an employee handbook which eliminated many of the benefits previously supplied by Tel Data, not required by the CBA. The handbook included both the previously announced phone card policy and the van policy.

2. Section 8(a) of the Act provides, in relevant part, that

> [i]t shall be an unfair labor practice for an employer—

> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [§ 7];
> ....
> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: ... [or]
> ....
> (5) to refuse to bargain collectively with the representatives of his employees....

29 U.S.C.A. §§ 158(a)(1), (3) & (5) (West 1973).

discharge constituted a further violation § 8(a)(1) and (5) of the Act, because it was done pursuant to the unlawfully implemented van policy.

We review the Board's findings of fact to determine whether they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C.A. § 160(e) (West 1973); *see NLRB v. C.J.R. Transfer, Inc.*, 936 F.2d 279, 281 (6th Cir. 1991). Evidence is deemed "substantial" if it is adequate to a reasonable mind to uphold the decision. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 463–65, 95 L.Ed. 456 (1951); *NLRB v. Brown–Graves Lumber Co.*, 949 F.2d 194, 196 (6th Cir.1991). Where there is disagreement between the Board and the ALJ, however, the reviewing court must examine the record with greater care. 949 F.2d at 197; *Litton Microwave Cooking Prods. Div., Litton Systems, Inc. v. NLRB*, 868 F.2d 854, 857 (6th Cir.1989). The significance, on review, of an ALJ's decision may depend on the importance of a determination of witness credibility in the particular case. *Brown–Graves Lumber Co.*, 949 F.2d at 197; *Litton Microwave Cooking Prods. Div.*, 868 F.2d at 857.

We note also that "[i]n an unfair labor practices proceeding, the Board bears the burden of proof and persuasion of showing that an employer has engaged in an unfair labor practice." *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 371 (6th Cir.1993). "To determine whether substantial evidence supports the Board's findings and conclusions, we should consider evidence in the record contrary to these conclusions." *Id.* at 368.

## I. *DISCHARGE OF FREDERICK*

Dale Frederick was ostensibly fired for violating Tel Data's November 12 phone card policy. Both the ALJ and the Board found this given reason to be pretextual,

holding that Tel Data actually discharged Frederick for engaging in protected activity. We hold that substantial evidence supports this conclusion, although this presents a close question.

The ALJ found that Tel Data's asserted reason for firing Frederick was pretextual based primarily on the testimony of Tel Data's supervisor, Ricky Nelson. Nelson testified that during the fall of 1991, he overheard vice president Phillip Tournaud refer to Frederick as an instigator of the employees' attempt to enforce the contract and state that "Dale would be history." Nelson also testified that he heard supervisor Steve Cowell say in reference to Frederick, "I can't help him, he's gone to the union, his days are numbered." In crediting Nelson's testimony over the denials of both Tournaud and Cowell, the ALJ acknowledged that Nelson and Frederick were good friends, but held that Nelson had forthrightly divulged this fact and that "there is simply no reason to believe that [Nelson] would fabricate testimony against his employer's interests no matter how strong their friendship may have been."

The ALJ concluded that Frederick's protected activity was a motivating factor in Tel Data's decisions to reprimand and discharge him. In particular, the ALJ noted: 1) that these disciplinary actions followed almost immediately after Frederick informed Griffin, at the December 13 meeting, that he was responsible for going to the union on his claim that Tel Data had failed to comply with the CBA; 2) that, in contrast to other employees when confronted with phone card abuse, Frederick, a nine-year employee with no history of disciplinary problems, was given no opportunity to explain his actions before his termination;[3] and 3) that Frederick was the only employee whose calls Cowell actually investigated to determine whether they were personal calls.[4] In sum, the ALJ found that

---

3. Cowell testified that employees Jim Quinn, Scott Burr and Joey Green were informed of the new phone card policy, and thereafter, charged personal calls on their cards. In contrast to Frederick, however, these employees were not fired; rather, they were only given warnings because Cowell discussed the situation with them

and determined that they had violated the policy by mistake.

4. The ALJ found much disparity in the way Frederick's case was investigated.

[t]he evidence as a whole convinces me that [Tel Data] decided to make an example of Frederick for having the temerity to insist that it honor all of the terms of the collective-bargaining agreement it had agreed to. This clearly incensed its top management which seized upon the first opportunity available to punish him for doing so.

Tel Data attacks this ruling by arguing that the ALJ failed to take into account Nelson's bias based on his close friendship with Frederick. The resolution of credibility questions of this type should ordinarily be affirmed unless they are "inherently unreasonable or self-contradictory." *Thomas Indus., Inc. v. NLRB*, 687 F.2d 863, 866 (6th Cir.1982). The record as a whole indicates that Tel Data harbored hostility toward Frederick (and the other employees) who had made an issue of its contract compliance. Tel Data argues also that Frederick's actions in this respect were deliberate and more egregious than that of other employees. Frederick, however, had not been the subject of any disciplinary action in more than nine years with Tel Data. There is substantial evidence to support the findings and the conclusions based thereon as to Frederick.[5]

We, therefore, **AFFIRM** the Board's finding that Tel Data discharged Frederick in violation of § 8(a)(3),[6] and we concur in the remedy set forth.

## II. *DISCHARGE OF SCOTT*

■ After finishing an assigned job in Jacksonville, Florida, on November 15, 1991, employee Scott drove a Tel Data van he had been using to Myrtle Beach, South Carolina, for a two-week vacation. The following day Scott was involved in a traffic accident, which he immediately reported to Cowell. After a week in Myrtle Beach, Scott drove the van, "which contained in excess of $20,000 of company equipment," to his home in Louisiana and had no further contact with Tel Data

until he called on November 25 to inquire as to why his expense check had not been deposited into his account. At that time Scott was informed by Cowell that he was being discharged for unauthorized use of a Tel Data vehicle.

The ALJ also noted, and substantial evidence supports his finding, that when working on out-of-town jobs using a Tel Data vehicle, Scott "was allowed to use it for a reasonable amount of *personal use on weekends.*" (Emphasis added). After a traffic accident in the van, Scott reported it to his supervisor Cowell at his home. Scott claimed that Cowell instructed him to call the office manager on the next work day and to send her accident reports; "not to worry about it." J/A at 15.

More than a week later, Scott called the office manager to inquire about his expense check after he had driven the van to his home in Louisiana (a total trip of some 1200 miles). At that point, Cowell advised Scott that he was being terminated for unauthorized use of the van. Scott filed a grievance, claiming that other employees engaged in the same conduct and that he had done nothing amiss. The union representative worked with Tel Data which then offered Scott reinstatement after a four or five week suspension without pay. Scott refused to sign the written proposal for reinstatement or to apologize. The union representative was disappointed and unhappy about Scott's decision, but Scott said he asked him to take the case to arbitration. The union representative, Parrish, testified that he told Scott that he was not sure the union would pursue the case to arbitration because it believed it had achieved a satisfactory settlement. In fact, the union decided it would not go forward to arbitration in light of the circumstances involved. The NLRB claims that Tel Data's termination of Scott was discriminatory and due to Scott's union connections and his asso-

---

5. We find no error in the Board's conclusion that Frederick's alleged falsifications of time records discovered *after* his termination would not have been a basis for discharge.

6. This conclusion pretermits discussion of the Board's assertion that, even if it erred in ruling

that Frederick was fired in violation of § 8(a)(3), its award of reinstatement and backpay in Frederick's case would still be appropriate based on its unchallenged ruling that his discharge violated § 8(a)(5). *See Respondent's Brief* at 23–24.

ciation with Frederick. The Board took the position that the van policy announced November 19 was more restrictive and adopted in retaliation against Scott.

The Board's decision in rejecting the ALJ's findings and conclusions as to Scott ("the issuance of the policy concerning van on out-of-town job assignments was not discriminatory or meant to retaliate") was that employees had been previously permitted "to use company vans on their weekends and days off." J/A at 3. The examples of such use pointed to by the Board were: (1) Neal Ingram's use of a van for one week, driving from Texas to Arkansas and returning *with prior knowledge;* (2) Keith Bolton's approved use of a van for a weekend to go from the jobsite to his parents' home, all within Florida, only a fractional distance compared to Scott's trip; and (3) Frederick's use of a van twice for one week trips to an adjacent state *with Cowell's knowledge.* J/A at 3. These uses are clearly different from Scott's extended use of the van without prior knowledge.

Parrish testified that before November 19, on a limited basis, it was "normal procedure that everyone used the vehicle as they pleased *on their days off and off-time and free-time.*" J/A at 283. We find an absence of substantial evidence to support the Board's position on the Tel Data van policy and with respect to retaliation against Scott. On the other hand, there is abundant evidence to support the ALJ's finding and conclusion "that the policy concerning out-of-town van use was neither changed nor discriminatory." J/A at 16. Employees, prior to November, 1991, generally obtained prior Tel Data approval for any trip or use beyond a weekend or for an extended trip. The before and after November 19 policy was basically unchanged.

No example mentioned by the Board comes even close to the kind of unauthorized use by Scott of a Tel Data van and his disregard of instructions about contacting the home office promptly after his accident. Scott's activity with the union had been minimal, and there was no evidence that Tel Data was aware of this, in contrast with Freder-

ick's role in promoting compliance with the CBA. The ALJ's findings noted that union dues were never deducted from Scott's wages during his three years of service with Tel Data. The ALJ, judging Scott's credibility, found his self-serving testimony "was fabricated," at least in part. J/A at 18. We conclude that the Board's purported basis for its decision is not persuasive under the facts and circumstances of this case. *See Smiths Indus. v. NLRB,* 86 F.3d 76 (6th Cir.1996).

In our view, the November van policy was essentially a codification of Tel Data's previous position on the issue. In addition to the lack of sufficient evidence indicating that Tel Data employees had unrestricted use of company vans prior to the implementation of the written van policy, Bolton testified that Scott stated before leaving for Myrtle Beach that "he knew he wasn't supposed to take the van on vacation, but the only way he would get in trouble is if he wrecked the van." This testimony, expressly credited by the ALJ, was not even addressed by the Board, though it purported to have adopted the ALJ's credibility determinations.

Accordingly, we **REVERSE** the Board's decision as to Sherry Scott, but **AFFIRM** in other respects.