NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

CHAMPION LABORATORIES,
INC., Respondent.

No. 95–2433.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 14, 1996.

Decided Oct. 24, 1996.

Aileen A. Armstrong, Linda J. Dreeben, Angela Washington (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, Stephen S. Shostrom, National Labor Relations Board, Peoria, IL, for Petitioner.

Thomas O. Magan (argued), Kahn, Dees, Donovan & Kahn, Evansville, IN, Mary Lee Franke, Ziemer, Stayman, Weitzel & Shoulders, Evansville, IN, for Respondent.

Before COFFEY, FLAUM, and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

Champion Laboratories, Inc. appeals a decision of the National Labor Relations Board ("NLRB") that it violated § 8(a)(1) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), when a supervisor asked an employee how many people attended a union meeting, and when another supervisor suggested to union activists that they should be ready to move to Mexico if the union succeeded in establishing chapters at the plants. Because we find that the record lacks substantial evidence to support the NLRB's findings, we deny enforcement.

## I.

Champion Laboratories, Inc. ("Champion," "Company") manufactures automobile filters at three non-union plants in Illinois. The plants employ about 1,750 workers. The United Automobile, Aerospace, and Agricultural Workers ("UAW," "Union") was interested in establishing chapters at Champion's plants, and began an organizational campaign. The Union held meetings for interested employees, and employees who supported unionizing passed out handbills outside the plants. Some employees also wore union buttons, T-shirts, and hats to work.

Champion, apparently, was less than thrilled with the prospect that the Union's endeavors might succeed. Shortly after the handbilling began, it sent employees a letter indicating that major automobile manufacturers were pressuring unionized suppliers to shift operations to Mexico, with the result that "UAW members ... are losing their jobs in record numbers." The NLRB and the Union accept that the letter was a lawful expression of the Company's views on unionization. 29 U.S.C. § 158(c). According to the NLRB, Champion also improperly tried to discourage pro-Union activities, and began enforcing various Company policies selectively against employees who openly supported the Union.

Two such incidents are the subject of this appeal. First, Gregory Benskin, who participated in handbilling and frequently wore several Union buttons to work, was filling out some paperwork related to the day's production in the office of Jim Smith, his supervisor. The two struck up a conversation. There had been a Union meeting the previous day. In the course of the conversation, Smith asked Benskin how many people from their production line had attended the meeting. Benskin told Smith that the meeting "didn't concern him." That ended the exchange; Smith and Benskin continued to talk on other matters.

The second incident occurred while two employees, Carl Bunting and Michael Ferido, were handbilling at an entrance of one of the plants. A supervisor named Judy Tate came out for a cigarette while they were there. Two workers from her production line, Carol Hixenbaugh and Tim Hatton, joined them. Tate asked Bunting what he was doing. In reply, Bunting handed her a handbill; she refused it and commented, "Well, I should have expected something like this from you, Carl." Hixenbaugh asked Bunting why he supported the Union. Bunting explained his position, and Tate then gave her reasons for opposing unionization. There is no suggestion by either party that this conversation

was improper. Hatton then commented that if the Union came in, they'd all have to learn Spanish. When no-one understood his "joke," he explained that it referred to the Company's being pressured to move to Mexico. As Bunting and Ferido continued to pass out handbills, Tate added, "I hope you guys are ready to pack up and move to Mexico." Tate, Hixenbaugh, and Hatton also apparently derived some amusement by the fact that while Bunting was talking to them, workers were entering the plant behind him without receiving handbills. They repeatedly pointed out to Bunting his missed opportunities. When the three had finished their cigarettes, they went back into the plant.

The UAW filed an extensive complaint against Champion with the NLRB, alleging unfair labor practices in violation of § 8(a)(1) of the Act. The complaint included the incidents involving Benskin and Bunting: the Union argued that Smith's question to Benskin constituted coercive interrogation, and that Tate's comment to Bunting was an implied threat to shut down the plant. After a hearing before an administrative law judge, the ALJ found in favor of the Union. He ordered Champion to cease and desist the unfair practices, and to post notices informing employees of their rights under the Act. Champion filed exceptions to the ALJ's findings with the NLRB. An NLRB panel affirmed the ALJ's findings, adopting his reasoning as its own. Champion filed a timely petition for review; the NLRB filed a cross-application for enforcement of its order.

## II.

■ Before reaching the merits of the case, we address a complaint Champion raises regarding the procedure with which the NLRB conducts its hearings. In determining whether a company has committed an unfair labor practice, the NLRB gives the company access to pre-hearing statements by NLRB witnesses only after the witness has testified, and then only for the purpose of cross-examination. 29 C.F.R. § 102.118(b). This practice, Champion argues, violates its right to due process, because it places the NLRB's counsel at an unfair advantage, and unduly hampers the company's ability effec-

tively to cross examine witnesses. We disagree.

■ NLRB rules must comport with the due process requirements of the Fifth Amendment. See NLRB v. Carolina Food Processors, Inc., 81 F.3d 507, 512 (4th Cir. 1996). We have long recognized, however, that litigants at Board hearings need not have available the full range of discovery procedures available in the federal district courts. NLRB v. Vapor Blast Mfg. Co., 287 F.2d 402, 407 (7th Cir.1961), cert. denied, 368 U.S. 823, 82 S.Ct. 42, 7 L.Ed.2d 28 (1961). The regulation of which Champion complains is analogous to the Jencks Act, 18 U.S.C. § 3500, under which a criminal defendant has access to pretrial statements of government witnesses only after the witness has testified. We agree with the First Circuit that just as the Jencks Act provides necessary protection to prosecution witnesses, so the restriction at issue here provides necessary protection to witnesses who will be testifying against an entity which controls their livelihood:

> [A] defendant in an unfair labor practice proceeding before an administrative agency is not constitutionally entitled to more [than a criminal defendant]. Not only is the defendant's interest less in a labor dispute, but the need to protect witnesses from reprisal is even more compelling, as a general rule, since the defendant is the witness' employer.... If the employer had access to the statement before trial, the employer could effectively discourage the employee from testifying and thus frustrate enforcement of the Act.

P.S.C. Resources, Inc. v. NLRB, 576 F.2d 380, 387 (1st Cir.1978). The case at bar was not so unusual that application of the Board's rule resulted in gross injustice. Vapor Blast, 287 F.2d at 407–08. Consequently, the Board did not deprive Champion of its right to procedural due process.

## III.

■ Section 8(a)(1) of the NLRA makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights ... to self-organization, to form, join, or assist labor organizations, to bargain collectively through

representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. §§ 157, 158(a)(1). The standard of review over NLRB findings is well established. We will sustain the Board's factual findings if the record as a whole provides substantial evidence to support them, even if we might justifiably have reached a different conclusion as a matter of first impression. 29 U.S.C. § 160(e); *NLRB v. Winnebago Television Corp.,* 75 F.3d 1208, 1212 (7th Cir. 1996). Similarly, we defer to reasonable NLRB conclusions in analyzing its application of the law to particular facts, in recognition of "the Board's special function of applying the general provisions of the Act to the complexities of industrial life." *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 236, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963); *Winnebago Television,* 75 F.3d at 1212. We also review the Board's statutory interpretations deferentially, because it is a statute the Board is entrusted with enforcing. *NLRB v. Joe B. Foods, Inc.,* 953 F.2d 287, 291–92 (7th Cir.1992); *but see Smiths Industries, Inc. v. NLRB,* 86 F.3d 76, 79 (6th Cir.1996) (Board's conclusions of law reviewed *de novo*).

 Champion does not contest the majority of the unfair labor practices found by the Board. These include the NLRB's findings that Champion violated § 8(a)(1) of the Act by telling a union activist he could not discuss the Union with other employees during work hours; selectively enforced a Company policy forbidding employees from leaving their work areas when on break against Union activists; selectively enforced against Union activists another policy denying off-duty workers access to production areas; and violated § 8(a)(3) by disciplining an activist for acting on behalf of the Union. Accordingly, we summarily enforce the Board's order with regard to these issues. *See U.S. Marine Corp. v. NLRB,* 944 F.2d 1305, 1314 (7th Cir.1991) (*en banc*). The uncontested violations, however, "do not disappear altogether. They remain, lending their aroma to the context in which the contested issues are considered." *Rock–Tenn Co. v. NLRB,* 69 F.3d 803, 808 (7th Cir.1995) (internal quotation omitted).

## A. COERCIVE INTERROGATION

 Champion first contends that Smith did not commit an unfair labor practice when he queried Benskin about the number of people on their production line who attended the Union meeting the previous day. We agree. Because it is not unusual for employees who interact with one another on a daily basis to converse about matters which affect their work, thus conversations between employees and supervisors do not violate the Act. *Guardian Industries Corp. v. NLRB,* 49 F.3d 317, 322 (7th Cir.1995). Even an interrogation does not, *per se,* violate the Act. *NLRB v. Complas Industries, Inc.,* 714 F.2d 729, 735 (7th Cir.1983). We categorize as "interrogations" within the meaning of § 8(a)(1) only those questions which, by word or context, suggest an element of coercion or interference. *Id.* Consequently, a question becomes coercive only when it is "likely to deter the interrogated worker (or others, who had heard about the interrogation) from supporting or ... working actively for the union." *NLRB v. Acme Die Casting Corp.,* 728 F.2d 959, 962 (7th Cir.1984). Factors which we weigh in deciding whether a particular inquiry is coercive include the tone, duration, and purpose of the questioning, whether it is repeated, how many workers are involved, the setting, the authority of the person asking the question, and whether the company had otherwise shown hostility to the union. *Id.* We also consider whether questions about protected activity are accompanied by assurances against reprisal, and whether the interrogated workers feel constrained to lie or give non-committal answers rather than answering truthfully. *NLRB v. Rain–Ware, Inc.,* 732 F.2d 1349, 1356 (7th Cir.1984).

Here, a supervisor sought to satisfy his curiosity about the Union's campaign by asking a subordinate how many people from their production line attended a union meeting. This question certainly bordered on the inappropriate, but it arose as part of an ordinary conversation, and nothing in the record suggests that the supervisor's tone was hostile, either before or after the ques-

tion. While the supervisor did not apologize for raising the issue, no threat of reprisal, explicit or implicit, accompanied the query. The employee properly told the supervisor that the meeting did not concern him. The supervisor accepted the rebuke as a response, and there the matter ended. Given the hostile atmosphere which already existed at the plants, it would have been better had the supervisor not asked the question in the first place. That, however, is not sufficient to transform a single query, addressed in private to a single worker who was in his supervisor's office for normal business reasons, into "coercive interrogation." *See Acme Die Casting Corp.,* 728 F.2d at 962.

■ The record contains no objective evidence that the question had a coercive effect. Clearly, it did not intimidate the worker to whom it was addressed: he handled the situation admirably. What matters, of course, is not whether an attempt at coercion in fact succeeded, but whether it has a tendency to coerce reasonable employees in exercising rights protected under the Act. *NLRB v. Q–1 Motor Express, Inc.,* 25 F.3d 473, 477 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 729, 130 L.Ed.2d 633 (1995). Nonetheless, we look at the issue from the perspective of the interrogated worker, *E & L Transport Co. v. NLRB,* 85 F.3d 1258, 1273 (7th Cir.1996), and the actual effect of the query, while not determinative, is certainly relevant to our inquiry. And that the supervisor backed off as soon as he realized that the worker had no intention of answering his question is highly significant. We have long recognized that "[i]t would be untenable, as well as an insulting reflection on the American worker's courage and character, to assume that any question put to a worker by his supervisor about unions, whatever its nature and whatever the circumstances, has a tendency to intimidate, and thus to interfere with concerted activities in violation of section 8(a)(1)". *Acme Die Casting Corp.,* 728 F.2d at 962. Given the circumstances, we think that Smith's question is one which a reasonable worker would, like Benskin, handle with aplomb. Consequently, we find that the record does not show the existence of an unlawful interrogation.

## B. THREATS

■ Champion also contests the NLRB's conclusion that supervisor Tate violated the NLRA when she commented, "I hope you guys are ready to pack up and move to Mexico." According to Champion, the NLRB's conclusion that Tate's remark constituted a threat of plant closure was unreasonable because Tate lacked decision-making power, and none of the workers could reasonably believe either that she could carry out the threat, or that it was made on behalf of the company. Moreover, Champion argues, there is no indication that Tate's comments intimidated or coerced anyone.

■ Our case law makes clear that Champion cannot succeed on these arguments, which confuse the standards applicable to threats with those applicable to coercive interrogation. *Guardian Industries,* 49 F.3d at 322. Unlike an interrogation, which is coercive only if reasonable employees would perceive it as such, a threat of plant closure is *per se* a violation of § 8(a)(1). *NLRB v. Electro–Voice, Inc.,* 83 F.3d 1559, 1570 (7th Cir.1996); *Central Transport, Inc. v. NLRB,* 997 F.2d 1180, 1191 (7th Cir.1993). The rationale behind this difference in treatment is that any threat of plant closure "reasonably tend[s] to coerce employees in the exercise of their rights." *Northern Wire Corp. v. NLRB,* 887 F.2d 1313, 1317 (7th Cir.1989); *Electro–Voice,* 83 F.3d at 1570.

■ Accordingly, the only question is whether Tate's words in fact comprised an implied threat. *Guardian Industries,* 49 F.3d at 322. Whether a threat was made is a finding of fact within the province of the Board's expertise. *E & L Transport,* 85 F.3d at 1273. As noted above, such a factual finding is conclusive if supported by substantial evidence. *Id.* In the case at bar, however, we find that the record as a whole does not support the Board's conclusion that Tate's remarks constituted an implied threat of plant closure within the meaning of the NLRA.

■ For one thing, in concluding that Tate's comment constituted an implied threat, the ALJ found that Tate repeated it

several times during the exchange with Bunting. Nothing in the record supports this conclusion. No one (including Tate) denied that Tate made the remark, but not a single witness hinted that she did so more than once. In contrast, every witness ·(including Bunting) agreed that after making the allusion to Mexico, Tate and the two workers with her repeatedly pointed out to Bunting that while he was discussing the Union with them, he was missing the opportunity to give handbills to workers who were entering the plant behind his back.[1] · The ALJ obviously conflated testimony about these remarks with testimony about the "Mexico" remark. In the face of evidence that the ALJ—and the Board, in adopting the ALJ's conclusions as its own—misread the sworn testimony, we cannot give his conclusions our usual deference. *NLRB v. Illinois–American Water Co.*, 933 F.2d 1368, 1374 (7th Cir.1991); *NLRB v. Cook Family Foods*, 47 F.3d 809, 816 (6th Cir.1995) ("Even in credibility matters, [a] reviewing court does not act ... as a mere rubber stamp for the administrative agency") (internal quotation omitted).

■ Champion complains in particular that the ALJ ignored the context of Tate's remark. Context is a crucial factor in determining whether a statement is an implied threat. *National By–Products, Inc. v. NLRB*, 931 F.2d 445, 452 (7th Cir.1991). We agree. Bunting and Ferido chose to do their handbilling at a rear entrance to the plant, where a picnic table was set up for employees on break. They concede that Tate simply happened to come out for a smoke while they were handbilling: there is no hint that her purpose was to confront them. Neither is there any suggestion that the exchanges between Bunting, Ferido, Tate, Hixenbaugh, and Hatton were other than "casual comment[s] made within the free flow of conver-: sation between workers and supervisors." *NLRB v. Dorothy Shamrock Coal Co.*, 833 F.2d 1263, 1266 (7th Cir.1987). Ferido, whose testimony the ALJ specifically credited, agreed that there was "joking going on back and forth" during the conversation. The ALJ also credited the testimony that

another worker (not Tate, the only supervisor present at the time) had ·made comments about having to learn Spanish, and reasonably concluded that Champion's (perfectly lawful) letter about being pressured to move to Mexico prompted the employees' comments.

Tate, then, essentially did nothing more than make an impromptu paraphrase of what another (admittedly anti-Union) worker had already said. Threatening statements are not usually made in bantering terms. *NLRB v. Windemuller Electric, Inc.*, 34 F.3d 384, 392 (6th Cir.1994). It is true, of course, that Tate's comments, unlike those of the employer in *Windemuller*, do not have the virtue of being particularly funny. *See id.* (implied threat less likely where those being "threatened" find the comment amusing). Indeed, had the NLRB argued more expansively that Tate's remarks as a whole would have a tendency to keep reasonable employees from exercising their protected right of canvassing for union support, we might be constrained to reach a different result. The Union, however, charged exclusively that the incident constituted a threat of plant closure, and the NLRB thus pursued only that limited issue. And while Tate's comment comes close to the edge of what is acceptable under the Act, we do not think the sworn testimony in the record provides substantial evidence to support the NLRB's conclusion that this single, off-handed remark threatened the workers with plant closure should they vote for unionization.

### CONCLUSION

The uncontested portion of the Board's order is enforced. Because we find ·that Champion neither engaged in coercive interrogation nor threatened plant closure, we deny the Board's petition to enforce the remainder of the order and grant Champion's petition to set that portion of the order aside.

ENFORCEMENT GRANTED IN PART, DENIED IN PART.

---

1. Neither the Union nor the NLRB made any claim that the latter remarks, which reasonably could be construed as taunting, violated § 8(a)(1).

RIPPLE, Circuit Judge, concurring in part and dissenting in part.

All aspects of the Board's order ought to be enforced. I cannot agree with my colleagues that the Board exceeded its authority in determining that the employer's interrogation of an employee about union activities and threat of a plant relocation constitute violations of the National Labor Relations Act. In both instances, the Board's order is not contrary to law and is supported by substantial evidence.

In assessing these issues, it is important to keep in mind several very basic, but controlling, propositions. "We must recognize the Board's special function of applying the general provisions of the Act to the complexities of industrial life." *NLRB v. WFMT*, 997 F.2d 269, 274 (7th Cir.1993). Congress has committed to the NLRB, and not to this court, the task of developing national labor policy through enforcement of the Act. *America's Best Quality Coatings Corp. v. NLRB*, 44 F.3d 516, 520 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995). Our task is limited to determining whether the findings of the Board are supported by substantial evidence on the record considered as a whole, *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477–88, 71 S.Ct. 456, 459–65, 95 L.Ed. 456 (1951), and whether its legal determinations have a reasonable basis in law. *America's Best Quality Coatings Corp.*, 44 F.3d at 520. Keeping these basic propositions in mind is especially important when, as here, we are called upon to review discrete acts of the employer that, although presented separately before us on appellate review, are, in the real world of industrial relations, part of a more extensive pattern of admitted anti-union activity. As my colleagues quite appropriately note, these uncontested violations "do not disappear altogether. They remain, lending their aroma to the context in which the contested issues are considered." *Rock–Tenn Co. v. NLRB*, 69 F.3d 803, 808 (7th Cir.1995) (internal quotation omitted). Assessment of each of the violations here required that the Board examine carefully the circumstances of the statement of management against the backdrop of the overall labor relations situation at that plant at that time. It required that the Board, in making that appraisal, rely upon a great deal of its own institutional expertise. The climate of labor relations in a facility faced with a representational effort by a Union is nuanced, and a cold record often fails to reveal the subsurface subtleties that are of primary importance.

A.

The court first rejects the Board's judgment with respect to the interrogation of Gregory Benskin by Mr. Smith. There is, of course, no question that the interrogation of an employee by a member of management about his union sentiments can constitute a violation of the Act. *NLRB v. Shelby Memorial Hosp. Ass'n*, 1 F.3d 550, 559 (7th Cir. 1993). Moreover, in order to establish a violation, it is not necessary to show that an attempt at coercion succeeded. Rather, an impermissible interference with the right of self-organization occurs when the employer engages in conduct that reasonably tends to interfere with, restrain or coerce employees with respect to union activities. *Id.* In assessing whether the employee's conduct can be so characterized, the Board must assess the statements from the viewpoint of the questioned employee. *NLRB v. Gold Standard Enters.*, 679 F.2d 673, 676 (7th Cir. 1982). Writing for the court in *Shelby Memorial Hospital Association*, Judge Kanne, although noting that the totality of the circumstances must be considered, delineated a non-exclusive list of factors that ought to be considered in determining whether the Board assessed the situation with sufficient comprehensiveness—the background of employer-employee-union relations, the identity and the authority of the questioner, the nature of the information sought, the place and the method of the questioning, and the truthfulness of the reply. He also noted that whether the employer gave a legitimate reason for the inquiry and whether the questioned employee was assured that no reprisals would follow are also important considerations. 1 F.3d at 559. *See also NLRB v. Acme Die Casting Corp.*, 728 F.2d 959, 962 (7th Cir. 1984) (delineating similar factors).

My reading of the opinion of the administrative law judge, as adopted by the Board, and my examination of the record convinces me that the Board's examination of these factors, although perhaps not as thoroughly articulated as it should be, sufficiently analyzes the exchange between Mr. Smith and Mr. Benskin to warrant our enforcement. The record establishes that the supervisor had requested specific information concerning the participation of his subordinates in a union meeting. The refusal of Mr. Benskin to answer is subject to a variety of characterizations. The Board could have concluded that Mr. Benskin's refusal to provide the information neutralized any coercive effect. However, in light of the other evidence of corporate anti-union animus exhibited, contemporaneously as a practical matter, the Board certainly was permitted to conclude that the episode had more deleterious effect on the labor relations atmosphere at the plant. The Board made no error of law; nor is its factual assessment so superficial that I can say that it did not take into consideration those factors that we have found relevant to the inquiry. Nor can I say that the Board's characterization of the encounter lacks substantial support in the record. Under these circumstances, it certainly is not our place to substitute our assessment for the expertise of the Board as to the implications of the employer's conduct on the labor relations environment in the plant.

## B.

The assessment of whether a particular statement by a member of management can be considered a threat that had an impact on the labor relations atmosphere of the plant is, of course, a most difficult assessment to make on a cold record. The pages of a typed transcript make it difficult, if not impossible, to differentiate between good-natured banter among workers and the sort of statement that, even if it be made in jest, threatens and intimidates the worker who is the object of the manager's remark. Here, the administrative law judge, relying explicitly on his observation of the demeanor of the two employees to whom the threat had been directed, determined that the statement violated the Act.[1] The court, acting on the cold record, disagrees with that decision. In my view, there is sufficient evidence in the record to justify—indeed to require—that we defer to the judgment of the Board. The statement at issue was made while the employees were engaged in union organizational activity and was made immediately after the supervisor had chided one of the employees for having engaged in such activity. The statement was also made in the wake of a statement by company officials that suppliers such as Champion were being pressured by the automakers to move to Mexico.

It is important that, as an institution, we remain faithful to the role designated for us by Congress in the enforcement of the labor laws of the United States. Because I believe that the court has deviated from that assigned role, I respectfully dissent from the court's decision to deny enforcement. In all other respects, I join the judgment and the opinion of the court.

---

1. We have frequently noted that we will not overturn the credibility finding of a hearing officer, except in the most extraordinary circumstances. *See Carry Cos. v. NLRB,* 30 F.3d 922, 926 (7th Cir.1994) (citing cases).