**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SOUTHWIRE COMPANY, Respondent.**

No. 84–8380.

United States Court of Appeals, Eleventh Circuit.

Oct. 14, 1986.

Rehearing and Rehearing En Banc Denied Nov. 20, 1986.

Stanley R. Zirkin, Washington, D.C., for petitioner.

Walter Lamberth, J. Lewis Sapp, Diana J. Rosenberg, Atlanta, Ga., for respondent.

Before GODBOLD and VANCE, Circuit Judges, and THOMAS,* Senior District Judge.

## CORRECTED OPINION

GODBOLD, Circuit Judge:

The National Labor Relations Board has petitioned this court for an adjudication that Southwire is in civil contempt of judgments entered by the Fifth Circuit in five previous unfair labor practice cases.[1] Southwire answered, and this court appointed a Special Master to hear evidence

---

\* Honorable Daniel H. Thomas, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

1. *N.L.R.B. v. Southwire Co.,* 313 F.2d 638 (5th Cir.1963) (*Southwire I*); *N.L.R.B. v. Southwire Co.,* 352 F.2d 346 (5th Cir.1965) (*Southwire II*); *Southwire Co. v. N.L.R.B.,* 383 F.2d 235 (5th Cir.1967) (*Southwire III*); *Southwire Co. v. N.L.R.B.,* 393 F.2d 106 (5th Cir.1968) (*Southwire IV*); *N.L.R.B. v. Southwire Co., et al.,* 429 F.2d 1050 (5th Cir.1970), *cert. denied,* 401 U.S. 939, 91 S.Ct. 932, 27 L.Ed.2d 218 (1971) (*Southwire V*).

In these prior proceedings the judgments of the court of appeals directed Southwire to cease and desist from:

(a) discrimination in regard to hire or employment (*Southwire I–V*);

(b) interrogating employees concerning membership in a labor organization (*Southwire I, IV, V*);

(c) threatening employees with plant closure or loss of jobs and the threat to never sign a union contract (*Southwire I, III–V*);

(d) maintaining a no solicitation rule for company property on non-work time in non-work areas (*Southwire II*);

(e) soliciting employees to report to it union activities (*Southwire IV*); and

(f) a general proscription against in any other manner interfering with employees in the exercise of rights to self organization, to form, join or assist labor organizations, to bargain collectively, to engage in concerted activity, or to refrain from any and all such activities (*Southwire I–V*).

and make recommended findings of fact and conclusions of law.[2]

Following an evidentiary hearing the Master issued his report and recommended remedies. Southwire and the Board filed exceptions, and the matter is before us on briefs and oral argument.

The Board's petition is based upon events that occurred during an organizational campaign by the United Steel Workers of America, AFL–CIO, to organize employees at Southwire's plants and facilities in Carrolton, Georgia in 1983–84. The Board alleges 24 specific unfair labor practices, which can be grouped into five categories: distribution of union materials, posting union materials on company lockers, refusals to permit posting union literature on company bulletin boards, oral solicitation, and other company acts of interference, restraint or coercion.

## I. Distribution of union materials

Southwire's rules and regulations, in effect during the period in question, prohibited the distribution of material tending to promote or publicize the activities of any individual, institution or organization in established work areas. Distribution was permitted in non-work areas, including break areas, parking lots and off company property.

The Master found that on three occasions, September 20, 21 and 30, 1983, union adherents distributing union material on parking lots were told by security guards that they could not pass out the material or loiter on the property and were ordered to leave, and the employees did so. The parking lots were non-work areas, and employees were on their own time. Except for one of the employees engaged in the distribution on September 30, management did not inform the employees involved in these incidents that they could distribute union materials during their non-work time on company property. Nevertheless some of the employees did distribute material on future occasions.

■ The Master found (p. 18–19) that the security guards were hired by a security firm that contracted with Southwire to provide various security services and were under the general supervision of Southwire. Their duties included policing areas outside the plant buildings and protecting Southwire property and personnel. They had the authority to restrict access to company property. They were charged with enforcing not only security rules but also work rules of the company, including solicitation and distribution rules. The Master did not find that the security guards had actual authority to halt the distribution in the parking lots but rather held that they acted within their apparent authority in stopping the parking lot distribution even if, in informing the employees that they were violating Southwire rules, they conveyed incorrect information. *Harrison Steel Castings Co.*, 262 N.L.R.B. 450, 455 n. 6 (1982). The Board held in *G.F. Business Equipment, Inc.*, 252 N.L.R.B. 866 (1980) that although one independent security guard had not acted as the employer's agent when the employer had not "ratified, condoned, or authorized" his acts, *id.* at 867, another guard had acted as the employer's agent when he informed employees, pursuant to his understanding of the employer's rules, that they could not distribute literature on company property. *Id.* at 872; *cf. Cabot Corp.*, 223 N.L.R.B. 1388, 1401 (1976) (adopting Administrative Law Judge's proposed order, which recognized that an independent security guard could act as an employer's agent but refused to so hold under the factual situation presented). Therefore, the fact that Southwire did not ratify or condone the conduct of the security guards does not diminish its responsibility for the action of the guards when acting within their apparent authority.

■ Southwire also says that the rights of the employees were not significantly curtailed and organizing efforts were not chilled, citing *Graham Architectural*

2. The present case is properly brought in the Eleventh Circuit because it is an agency case arising within the geographical confines of the circuit.

*Products Corp. v. N.L.R.B.*, 697 F.2d 534 (3d Cir.1983). Applying the "clearly erroneous" test, *N.L.R.B. v. J.P. Stevens & Co.*, 538 F.2d 1152, 1160 (5th Cir.1976), we hold that the findings of the Master that more than a "momentary inconvenience" or "slight interference" with the employees' rights was involved and that the employees were effectively precluded from engaging in lawful solicitation activity for the remainder of the day in question, are not clearly erroneous. As to these occurrences the conclusion of the Master that the Act was violated must stand.

■ On October 3 employees were distributing literature inside the turnstile of a company gate. They did not block the entrance. A security guard told the employees that solicitation on company property was not permitted, and he wrote down the name and badge identification number of each employee. Dialogue ensued involving the security guard, supervisors, the employees, and a union agent who was not an employee. At least one of the union agents was told that employees could handbill but that non-employee union organizers could not. By that evening a supervisor had distributed written instructions to all security officers stating that they could not interfere with Southwire employees attempting to gain support for the union if the employees were not breaking any rules or regulations; he noted that employees could distribute union material on company property in any area except designated work areas.

The Master found that on the October 3 occasion the employees never ceased distributing literature and that both the security guard and plant superintendent told the employees they would check with their supervisors to determine whether their instructions to the employees were correct. Thus, despite the dialogue between the several people involved, the security guards' orders were not enforced, and the employees freely distributed union literature on company property on future occasions. Therefore, the Master concluded, the acts of the company on this occasion were not

coercive and no violation of the Act or of the prior orders of the court was involved. These conclusions of law by the Master are not erroneous.

## II. Prohibition against posting union materials on lockers

■ The Master found that in three incidents (involving employees Bass, Runels and Dowdy) employees posted union stickers or literature on or in storage lockers that were furnished them, and a supervisor either removed the material or ordered it removed. He found that the company permitted posting other types of materials on lockers.

Southwire does not question the findings on the Runels and Bass incidents. But it attempts to distinguish the Runels incident on the ground that his storage locker or compartment, allowed him for his tools, was part of a work table that was different in type and location from the lockers furnished other employees and was newly painted. The Master found that was no rational basis for enforcing different posting rules for one type of storage place supplied an employee and another type of storage place and that all lockers were routinely cleaned and painted, after which employees posted stickers on them without interference. These findings are not clearly erroneous.

A supervisor removed stickers from employee Bass' locker. The company contends there was no coercive effect because the supervisor attempted to return the stickers to Bass but he declined them since they were "crumbled up." We accept the findings of the Master that the supervisor's actions were prompted by anti-union animus, that the supervisor (after being told by her superior that her act was improper) did not apologize or tell Bass that he could post the stickers on his locker; and that Bass placed no more stickers on his locker after this incident. Moreover, the Master found that this was not an isolated incident.

Southwire's objections to the findings on the Dowdy incident are based on credibility grounds and we reject them.

III. Refusal to permit posting of union materials on company bulletin board

Three types of bulletin boards are in use at Southwire's facilities. A general information bulletin board, maintained in each department, is for posting industrial relations notices, safety information, and other material of general information to employees. Chapel bulletin boards are for notices of a religious nature. Trading post bulletin boards are located in non-work areas of the plant, and, as the title suggests, are used by employees who wish to advertise items to buy, sell or trade. According to company rules, notices placed on the trading post board must be no larger than $3 \times 5$ inches and must be given to the Employees Services Department for posting. The bulletin boards have glass doors which are locked, so only Employees Services personnel have access to them. The rules provide that "Notices of outside activities such as school, church, clubs or any organizational, institutional, or social activity will not be permitted." On three occasions employees asked permission to post union handbills, each on legal size paper, on a trading post bulletin board. One employee was turned down because his handbill was said not to meet the qualifications or requirements for posting on the trading post board. A second was turned down because his handbill was deemed unsuitable for this bulletin board. The third employee was told by the person of whom he sought permission that "he would see what he could do," but the notice was never posted and no reason for the denial was ever given to the employee.

■ There is no statutory right for an employee or a union to use an employer's bulletin board. The prohibition of the Act comes into play when the employer otherwise assents to employee access to the bulletin board and discriminatorily refuses to allow the posting of union notices or messages. *Allied Stores of New York*, 262 N.L.R.B. 985, 985 n. 3 (1982) (citing *Container Corp. of America*, 244 N.L.R.B. 318 (1979), *enforced in pertinent part*, 649 F.2d 1213 (6th Cir.1981)). The Master concluded that once Southwire allowed non-work related announcements on the "buy, sell or trade" bulletin boards, it could not thereafter have a valid managerial reason to exclude union notices, and that the company's interest in limiting access to the bulletin boards for prescribed types of announcements was outweighed by the employees' § 7 rights of communication, citing *Union Carbide Corp. v. N.L.R.B.*, 714 F.2d 657, 660 (6th Cir.1983) and *N.L.R.B. v. Honeywell Inc.*, 722 F.2d 405, 406 (8th Cir. 1983). He also concluded that the company might legitimately limit the size of notices and limit duration, but it could not exclude an item based upon content.

Employees testified to seeing notices for outside organizations posted on the trading post bulletin boards. Two employees described notices of sporting events, church meetings, and blood drives posted underneath the glass on the boards, areas to which only the Employees Services Department had access. The company contends that it exercised complete and consistent control over the use of the trading post boards and that they were used for their narrow specific purpose and no other. It contends that the Master did not make credibility findings as between employees who testified to notices of outside organizations and events as opposed to the testimony of management personnel.

■ We do not need to adopt the Board's argument that once a bulletin board is made available for any designated type of non-work related notice the employer may exercise no control over content and employees ipso facto have an unlimited right to post union materials. Board and company each introduced a photograph identified as a trading post bulletin board. They are different boards. But each contains notices of varying sizes and types, including sizeable photographs of automobiles and houses. While these exhibits do not visually show subject matter other than "buy, sell or trade" notices, they do refute the company's position that it consistently policed the boards and uniformly enforced its rules relating to them.

Therefore, we affirm the Master's conclusion that the company violated the Act by refusing access to the trading boards, but for a different reason.

### IV. Distribution of union materials in break rooms

Company rules permit distribution of printed materials in non-work areas, including break areas. Some two months before the open organizational efforts began a plant manager sent a superintendent to the manager of the machine shop informing him that his employees were leaving trash on break room tables and asking him to require employees to help keep the area clean. The supervisor warned the machine shop employees about leaving trash in the break room.

In late September an employee handed out union literature in a break room in another part of the plant. A supervisor present informed him, in front of the other employees, that by distributing union literature in the break room he was "pushing his luck" and violating company rules and that he could be fired if he did it again. The employee, Bowe, explained that he thought he had a right to distribute and asked the supervisor to check on his information. The supervisor asked his supervisor and was told that he was not correct in reprimanding Bowe. The next day the errant supervisor apologized to Bowe and told him that he could distribute union materials during non-work time in non-work areas. The supervisor did not inform the other employees who had been present during the incident of his error unless they specifically asked him.

In a separate incident an employee of the machine shop placed union literature on tables in a break room. He was told by another employee that members of management had threatened to fire employees who left trash in the break room. This prompted the employee, Ragsdale, to admit to his supervisors that he had placed union literature in the break room and caused him to ask whether he was permitted to do this. The labor relations manager told him that since the company had some little problems [about litter] in the machine shop break room a few months earlier, and employees had been put on notice about the problem, an employee could be notified that if he continued to litter the break room he could be subject to discipline. Ragsdale's supervisor told him that he could read union literature on break but that, like all other trash, it must be disposed of when the break was finished. Ragsdale testified he never left union materials in the break room again since he felt his job was threatened.

Other non-union literature, including information on the company, and on other industries, and on church organizations was left in various break rooms at different times, and in particular in the machine shop break room on the day Ragsdale left his union literature.

■ The Master found that the incident involving Bowe was not an unlawful interference with an employee's distribution rights because Bowe was not precluded from distributing union literature on that day or on future occasions. He found, however, that Wynn's statement to Bowe, made in front of the other employees present, that he could be fired if he attempted to distribute in the room again was both coercive and intimidating and was not effectively repudiated. *United States Postal Service*, 253 N.L.R.B. 1203 (1981). We reject the contention of the Board that the Master erred in concluding that Wynn's actions did not amount to unlawful interference with an employee's distribution rights since Bowe was not precluded from distributing literature on that day or in the future.

With respect to the Ragsdale incident concerning leaving union literature in the machine shop break room, the Master found that this did not involve an unlawful restriction on an employee's distribution rights but a disparate enforcement of the cleanliness policy developed about two months previously. He found that the evidence supported a finding that other literature was left in the same break room on the same day as Ragsdale left union litera-

ture, but only Ragsdale was warned about keeping the room clean. This is not clearly erroneous.

### V. Other acts of interference, restraint or coercion

The Master found several incidents of interference, restraint or coercion.

On August 18, 1983, a conversation between supervisor Terrell and employee Runels (threat of cut in wages and plant closure).

In September 1983, a conversation between supervisor Robinson and employee Runels (threat of plant closure).

In September 1983, a conversation between superintendent Morris and employee Bell (threat of loss of benefits, loss of jobs or of full time employment).

In October 1983, supervisor Jones and employee Vance (threat of loss of job for supporting union).

In October 1983, supervisor Roberts and employee Warren (surveillance).

We accept the conclusion of the Master that all of these incidents were coercive.

The objections of Southwire, based largely on credibility grounds and sufficiency of evidence grounds, are rejected.

### VI. Remedies

■ In recommending a remedy the Master considered several factors. He considered the character and magnitude of the harm threatened and the possible effectiveness of a suggested sanction in bringing about the desired result. He noted the duty of the Board in a litigated case to employ broader and more stringent remedies against a recidivist than those invoked against a first offender. *Containair Systems Corp. v. N.L.R.B.*, 521 F.2d 1166, 1171 (2d Cir.1975).

The Master set out several considerations that favored the company. None of the illegal acts by the company involved discharge or discipline, only verbal warnings. Attempts were made by the company to correct violative acts, including meetings by Southwire's labor relations manager with all company managers and supervisors, a written directive to all security guards on October 3 and several unsuccessful efforts by supervisors to retract illegal statements and apologize to affected employees. Only five percent of management was alleged to have been involved in any wrongdoing, and only 1.5 percent of the company's employees were alleged to have been the subject of or witness to any unlawful conduct. Further, no evidence was presented that any of the violations adversely influenced the organizing campaign. Employees freely distributed union literature in the parking lots on occasions after it was initially inhibited. Union literature was left in the break rooms at various times. Employees freely solicited for the union at work during non-work time.

Other mitigating circumstances found to exist were that there was no evidence that word of the company's unlawful conduct was prevalent among the employees. There was no showing of plant-wide coercion or anti-union animus that directly or measurably affected the union's organizing campaign.

On the other hand company officials, including members of upper management, were involved in some of the violations that occurred. Many violations were similar to those that led to prior orders of the Fifth Circuit. The Master found that a few Southwire supervisors, despite instructions to the contrary, continued to carry on an anti-union campaign that was contrary to the company's expressed wishes. He thus concluded that the remedy fashioned must contain sanctions stronger than those previously imposed and that it was not adequate for the company simply to request its supervisors to refrain from unfair labor practices.

Bearing these factors in mind, the Master recommended:

(a) That Southwire, and its officers and agents, conduct themselves in accordance with prior judgments and with the contempt adjudication of August 26, 1970; that they refrain from coercive interrogation, threats, prohibition of union solicitation or distribution of campaign materials

in non-work areas and on non-work time and refrain from discriminatorily enforcing no solicitation and no distribution rules and no posting rules.

(b) That Southwire remove from employees' records any adverse reports or notations concerning violations of the prior judgments.

(c) That Southwire post a notice that it has been adjudged in civil contempt and that it will immediately undertake the purging actions directed by the court, and mail copies of the notice to former employees found to have been the subject of or witness to violations, and that it convene during working hours all of its employees and read to them the contents of the notice.

(d) That Southwire issue written instructions to all supervisors to comply with the underlying judgments and prior adjudication as well as the new order.

(e) That the company file a statement with the clerk of this court and the regional director of the Board showing steps taken by it to comply with this court's directions.

(f) That Southwire grant to the Board access to its facilities or records to verify compliance.

(g) That Southwire pay to the Board costs and expenses, including attorneys' salaries, incurred by the Board in this matter, and pay a prospective fine of $10,000 for each and every future violation of the judgment and, if the violation is a continuing violation, an additional fine of $1,000 per day for each day that the violation continues.

(h) That this court reserve jurisdiction to issue attachment against the company for any future violation.

The Board had proposed a prospective fine of $20,000 per violation and $2,000 per day. The Special Master rejected these amounts as too severe under the circumstances. On its part Southwire notes that during a 13-year period between 1970 and 1984, although four different organizing campaigns were instituted, no violations of the Act by it were found. It noted the finding by the Master that none of the violations in the present proceedings was flagrant and that some occurred because members of management ignored orders of the company, and at times explicit instructions did not filter down to all supervisory levels.

This court may accept, reject or modify the Master's recommendations as to remedial relief, adapting them to the circumstances of the case, so long as they are remedial or coercive but not penal. *Florida Steel Corp. v. N.L.R.B.*, 648 F.2d 233, 239 (5th Cir. Unit B 1981).

We have considered that three of the violations involving security guards resulted in de minimis interference with distribution of union literature. The company promptly issued clarifying instructions and repudiated the guards' actions. Literature was freely distributed thereafter. One of the incidents of removal of pro-union stickers from storage lockers was retracted. The coercive conversations and interrogations involved statements by low-level supervisors to seven of Southwire's 2,900 employees in one-on-one conversations. The Master found that word of the company's unlawful conduct was not shown to be prevalent among the employees.

We accept the recommendations of the Master for a prospective fine of $10,000 per violation and for payment of attorneys' fees and costs. We do not accept the recommendation of a continuing fine of $1,000 per day. A continuing fine is a Draconian measure. In factually disputed situations, and even in factually undisputed borderline situations, months or even years may be required to determine whether a violation has occurred, during which the continuing fine may be accruing daily.

The Special Master declined the request of the Board that the union be granted reasonable access to plant bulletin boards and non-work areas for a period of two years; that names and addresses of current employees be supplied to the union on request for two years; that union representatives be given notice and opportunity to be present at any address made by the

company to its employees on the question of union representation and that union representatives be given equal time and facilities to respond; that for a period of two years, prior to any Board election which may be scheduled, the union be entitled to deliver a 30–minute speech to employees on work time. We accept the Master's recommendations that these proposed remedies not be adopted.

Except as herein rejected the Master's recommendations as to remedial relief are accepted.

The report of the Special Master is ACCEPTED in part and REJECTED in part. The judgment of this court will issue accordingly.