**J.C. PENNEY COMPANY, INC., Petitioner, Cross–Respondent,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.**

Nos. 96–3679, 96–3994.

United States Court of Appeals, Seventh Circuit.

Argued June 2, 1997.

Decided Aug. 29, 1997.

Jack D. Rowe, Brian N. Woolley (argued), Lathrop & Gage, Kansas City, MO, for petitioner J.C. Penney Company, Incorporated.

Elizabeth Kinney, National Labor Relations Board, Chicago, IL, Aileen A. Armstrong, Fred L. Cornnell, Jr. (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, F. Rozier Sharp, Overland Park, KS, for petitioner National Labor Relations Board.

Steven B. Goldstein, National Labor Relations Board, Contempt Litigation Branch, Washington, DC, Elizabeth Kinney, National Labor Relations Board, Chicago, IL, Aileen A. Armstrong, Fred L. Cornnell, Jr. (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, for respondent National Labor Relations Board.

Jack D. Rowe, Brian N. Woolley (argued), Lathrop & Gage, Kansas City, MO, Cynthia G. Farris, J.C. Penney, Incorporated, Dallas, TX, for respondent J.C. Penney Company, Incorporated.

Before BAUER, CUDAHY, and KANNE, Circuit Judges.

BAUER, Circuit Judge.

This appeal concerns J.C. Penney Company's petition for review of an order of the National Labor Relations Board ("the NLRB" or "the Board"), which found that J.C. Penney had violated § 8(a)(1) of the National Labor Relations Act ("the NLRA"). Specifically, the Board adopted the findings and order of an administrative law judge ("ALJ"). The ALJ concluded that a J.C. Penney supervisor threatened an employee with discharge because of her union sympathies and that J.C. Penney maintained a discriminatory policy which prohibited the posting of union materials on company bulletin boards and work carts that were otherwise available for general use by the employees. The Board filed a cross-application for enforcement of its order. We deny the Board's request to enforce that part of the order requiring that J.C. Penney cease and desist from threatening employees with the loss of employment because of their union activities. We grant the Board's request for enforcement of the remainder of its order.

## Background

J.C. Penney operates a large Catalog Fulfillment Center ("the CFC") in Lenexa, Kansas. In early 1995, the International Brotherhood of Teamsters, Local Union No. 41, AFL–CIO ("the union"), began a campaign to organize the more than 1,000 employees who work at the CFC. Employee supporters of the union started distributing union materials in the CFC shortly thereafter. This case arose when a regional director of the NLRB issued a complaint in response to union charges that during the union's campaign, J.C. Penney violated §§ 8(a)(1) and (a)(3) of the NLRA.

Diana Sanders Jaccard was (and, as far as we know, still is) a J.C. Penney employee. Because a wrist injury prevented her from performing her regular duties, Jaccard was given a temporary position at J.C. Penney's Central Warehouse Office, beginning in late summer of 1994 and scheduled to end in early 1995. Jaccard was a union supporter. On or about February 2, 1995, the union sent a letter to J.C. Penney stating that several employees, including Jaccard, supported the union's efforts to organize employees at the CFC. After her temporary position came to an end, Jaccard was placed on medical leave in March 1995. Eventually, Jaccard's medical restriction was removed, and she was reinstated in a new department with a permanent position and a higher salary.

Part of the reason for the NLRB's issuing a complaint had to do with an incident during Jaccard's tenure in the temporary position. Jaccard testified before an ALJ that on February 13, 1995, Mark Smith, a Central Warehouse supervisor, approached her and they discussed Jaccard's pending marriage. Joanne Wells, another employee, was also

present. During the course of this conversation, Smith noticed that Jaccard was wearing a union button and stated, "Oh, you're for the Union." When Jaccard did not respond, Smith said, "I'm glad you got a husband." Wells turned to Jaccard and said, "Oh, you won't live long." Smith looked sharply at Wells and then walked away. After this incident, Jaccard stopped wearing any union buttons and instead put them inside or attached them to her purse. Before the ALJ, Smith denied that he ever saw Jaccard wearing a union button and that he ever made the statements. Wells did not testify. The ALJ found Jaccard's testimony to be credible. He concluded that Smith's remarks threatened Jaccard with discharge because of her union activities, in violation of § 8(a)(1) of the NLRA.

This appeal also concerns J.C. Penney's policy on posting union materials. J.C. Penney had a policy in effect since 1977 which forbade displaying personal items, solicitations, or anything else that was not company-sponsored or did not have a direct effect on work. J.C. Penney did allow its employees to post a company-approved newsletter, the *Lenexa Board of Trade*, which publicized employee personal items for sale.

The ALJ found that nonwork-related materials regularly appeared on some of the CFC's bulletin boards. Some of these postings were company-sponsored solicitations for the United Way and the March of Dimes charities. Others were personal and unapproved, including thank-you notes, party announcements, Christmas cards, a solicitation for maid service, and collections when employees died or were hospitalized. The ALJ found that at least some of the personal, unapproved materials remained posted for long periods of time. J.C. Penney considered union materials a solicitation. Supervisors removed union materials from bulletin boards, but, in at least one instance, J.C. Penney left untouched an adjacent noncompany posting.

The ALJ found that J.C. Penney's enforcement of its rule against unapproved postings was "spotty." The ALJ also considered J.C. Penney's admission that union postings would never be approved even though other personal postings regularly appeared on the boards. Under these circumstances, the

ALJ concluded that J.C. Penney's policy of removing unapproved postings from its bulletin boards was "disparately applied to union materials." The ALJ found J.C. Penney in violation of § 8(a)(1) of the NLRA.

Employees at the CFC often personalized their carts with stickers, photographs, and other materials. On March 10, 1995, Operations Manager Tom Riechl removed two union bumper stickers from employee Paul Farris' work cart, but left untouched several nonunion stickers and family pictures attached to the cart. When Farris called Personnel Manager Jeffrey Sembler to complain, Sembler told Farris that he could personalize his cart with family pictures but that he could not have offensive pictures, cartoons or sayings. Farris was also instructed that employees were not permitted to put union stickers on their carts because the carts were company property, and union stickers constituted solicitation material. The ALJ concluded that J.C. Penney had permitted the decoration of work carts and that Riechl's removal of the union stickers and Sembler's affirmation of that action were discriminatory modifications of J.C. Penney's permissive practice toward work cart decoration. The ALJ concluded that J.C. Penney again violated § 8(a)(1) of the NLRA.

On November 9, 1995, management personnel and employee representatives held a meeting. Randy Heldenbrand, an employee representative, asked CFC Manager Frank Kemp why J.C. Penney had removed union materials from the cafeteria tables. Heldenbrand testified that Kemp responded that he did not have to provide an open forum for the union inside the CFC. Heldenbrand then inquired about a rumor that some bulletin boards for posting union materials would be available. Heldenbrand recalled that Kemp did not respond and went on to discuss another subject. Shortly thereafter, the minutes of the meeting were posted. The minutes of the meeting stated:

Q: Flyers were passed out this week concerning the union. Why did management pick them up? I was told it was against the law to pick them up.

A: We have easels to display union material as well as our response. One of the

main reasons that we went to displaying information both ours and theirs on easels was to minimize the miscellaneous papers being posted and left laying [sic] around. Heldenbrand testified that no mention was made of easels at the meeting. Kemp did not testify, but Sembler recalled that the question was asked and that Kemp stated that J.C. Penney generally picked up all unattended materials left on cafeteria tables.

Around this time, J.C. Penney began placing union materials on easels throughout the CFC. Usually J.C. Penney would post a union notice and would include its own position alongside the notice. The ALJ found that the easel postings were no defense to the unlawful removal of union materials from bulletin boards. The ALJ stated that J.C. Penney was welcome to display union materials and its response on easels, but that J.C. Penney's answer to Heldenbrand's question in the minutes implied that union materials were removed from the cafeteria and bulletin boards because easels were available. This left employees with the impression that the easels were the only proper means of circulating union materials at the CFC. The ALJ therefore found that J.C. Penney's announcement of its easel policy was a violation of § 8(a)(1) of the NLRA.

In a July 1, 1996 order reflecting his findings, the ALJ ordered J.C. Penney to cease and desist from maintaining or enforcing any rule or policy that discriminates as to the posting of union materials on bulletin boards or work carts that are otherwise available for general employee use or that implies that union materials will only be posted on easels. The ALJ further ordered J.C. Penney to cease and desist from threatening employees with the loss of employment because of their union sympathies. He also ordered J.C. Penney to cease and desist from, "in any like or related manner," interfering with, restraining, or coercing employees in the exercise of their rights guaranteed by § 7 of the NLRA. Finally, the ALJ ordered J.C. Penney to withdraw and rescind any of its rules or policies (1) which discriminatively restrict its employees' use of bulletin boards or postings on work carts which are otherwise available for general employee use or (2) which imply that union materials will only be posted on company easels.

On September 30, 1996, a three-member panel of the NLRB considered the ALJ's decision, affirmed his rulings, findings, and conclusions, and adopted his recommended order. On October 24, 1996, J.C. Penney filed a petition for review, and on December 2, 1996, the NLRB filed a cross-application for enforcement of its order. The two cases were consolidated for purposes of appeal.

## Analysis

■■■ We will uphold a Board order if there is substantial evidence in the record to support its findings of fact and if its conclusions of law have a reasonable basis in the law. *Dilling Mechanical Contractors, Inc. v. NLRB*, 107 F.3d 521, 524 (7th Cir.1997); *see* 29 U.S.C. § 160(e), (f). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citations omitted). It is not our place to engage in our own fact finding or supplant the Board's reasonable conclusions "even though [we] would justifiably have made a different choice had the matter been before [us] *de novo.*" *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). However, "a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Id.*

■■■ Section 7 of the NLRA provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." 29 U.S.C. § 157. Section 8(a)(1) of the NLRA considers it an unfair labor practice for an employer to restrain, coerce, or interfere with employees in their exercise of the rights conferred in § 7. 29 U.S.C. § 158(a)(1). "Threats of discharge, discipline, plant closure or other reprisals against employees for engaging in union activity are unlawful and violative of section 8(a)(1) of the Act because these acts reason-

ably tend to coerce employees in the exercise of their rights, regardless of whether they do, in fact, coerce." *Northern Wire Corp. v. NLRB*, 887 F.2d 1313, 1318 (7th Cir.1989).

▇ Whether a threat was made is a finding of fact within the Board's expertise. *NLRB v. Champion Lab., Inc.*, 99 F.3d 223, 228 (7th Cir.1996). In determining whether a statement constitutes a threat of discharge, we consider the economic dependence of the employee on his employer and the necessary tendency of the employee to pick up intended implications of the employer that might be more readily dismissed by a disinterested ear. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969). Context is a determinative factor in considering whether a statement is an implied threat. *Champion Lab*, 99 F.3d at 229. We must differentiate between a threat and an exchange which amounts to nothing more than "casual comment[s] made within the free flow of conversation between workers and supervisors." *Id.* (citing *NLRB v. Dorothy Shamrock Coal Co.*, 833 F.2d 1263, 1266 (7th Cir.1987)).

During the hearing before the ALJ, Jaccard was asked about the exchange between herself and Smith. She testified as follows:

Q: Now, after you began wearing this union button, Teamster's button to work, did any member of management ever talk to you about the button or comment on the button in any way?

A: Yes, they did.

Q: Who was that supervisor that commented to you?

A: Mark Smith.

\* \* \* \* \* \*

Q: So it was about the end of the work day for you?

A: Yes.

Q: When you were working, was anyone else in the area?

A: Joanne Wells.

Q: And who started the conversation between yourself and Mr. Smith, you or Mr. Smith?

A: Mr. Smith.

Q: And what did he do to start up the conversation?

A: He said, "Hi. How are you doing?"

Q: Then what did he say?

A: Then he says something about the fact about, "When are you getting married?" I said, "Well, we set the year but not the date." And he looked—do you want me to go on?

Q: Yes.

A: Okay. And during the conversation he looked down and saw I was wearing a union button and he stepped back like, "Oh, you're for the union?" And I didn't say anything.

Q: First of all, he saw the union button.

A: Yes.

Q: And did he stop or pause for a minute or did he start talking right away?

A: He paused for a second. I don't know. I can't give how long, but he stopped and he looked at the button and he says, "Oh, you're for the union?" And I didn't say anything.

Q: Did his tone of voice change when he asked you, "Are you for the union," compared to the first statement that he made to you about getting married?

A: Yes, he did.

Q: And how did that tone of voice change?

A: It was disappointment. It was harder, like, "Oh, you're for the union."

MR. ROWE [outside counsel for J.C. Penney]: I'd object to the characterization of the tone of voice. This witness is trying to put herself in the place of another person. Object—

ADMINISTRATIVE LAW JUDGE METZ: Overruled. I think she can testify to what she heard, characterize it.

BY MS. STUART [counsel for the General Counsel of the NLRB]:

Q: Okay.

A: I didn't say anything after that, and he says, "Oh, I'm glad you got a husband." And after that, after he said that, Joanne Wells said, "Oh, you won't live long." And then Mark with a face on him like, "Oh, she shouldn't have said that," you know, and he turned around and walked away. He didn't say anything to Joanne.

Q: Now, after this conversation that you've just testified about with Mr. Smith,

did you change your practice with regard to wearing union buttons to work?

A: Yes, I did. I started not wearing them on me, but I'd start putting them in my purse. And I kept my purse in my desk. And at work when I go in now, they could be seeing at the time clock, but I never carried it. The only time I carry my purse is when I got in the building and out the building.

Q: So your purse wouldn't be out during the work day?

A: No.

At the hearing before the ALJ, Smith denied that he ever saw Jaccard wearing a union button, that he had any conversation with her about the union, and that he ever threatened her with discharge because of her support of the union. The ALJ credited Jaccard's testimony.

 An ALJ's credibility determination is entitled to great deference, and his resolution of a "swearing match" between two conflicting witnesses should not be set aside "unless one of the witnesses testified to something physically impossible or inconsistent with contemporary documents." *Guardian Indus. Corp. v. NLRB*, 49 F.3d 317, 321 (7th Cir.1995). We will overturn an ALJ's credibility finding "only when extraordinary circumstances so require." *Dilling Mechanical Contractors, Inc. v. NLRB*, 107 F.3d 521, 524 (7th Cir.1997) (citations omitted). We will uphold the ALJ's credibility determination here because we find no exceptional circumstances compelling us to set it aside.[1]

 However, even though the ALJ's credibility determination warrants substantial deference, "[a] court must assess an agency's stated rationale." *Guardian Indus.*, 49 F.3d at 322 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943)). "[W]e cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the

result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996) (citations omitted). In the case before us, the Board adopted the ALJ's rationale. The ALJ stated:

Based on the demeanor of the two witnesses I credit Jaccard who gave a detailed description of the encounter and seemed to accurately relate her recollection. Smith gave a general denial of the event and was not persuasive in his demeanor or denial. I find that under all of the circumstances Smith's remarks were a reference to the possibility of Jaccard losing her employment because of her support for the Union. Respondent has violated Section 8(a)(1) of the Act by this threat.

We find no logical bridge here. The ALJ apparently interpreted Smith's comment "I'm glad you got a husband" to mean that Smith threatened Jaccard that she would be fired for her union support and that it was a good thing that Jaccard would soon be getting married so that her husband could help her out financially while she was unemployed. Apparently, the ALJ found that because Smith's testimony was not credible, he must have threatened Jaccard with discharge. The fact that the ALJ found that Jaccard was telling the truth does not mean that Smith's remarks were in fact a threat. There is a long jump between the credibility determination and the ultimate finding that Smith's remarks were a threat of discharge; too long a jump to withstand scrutiny.

 Moreover, the ALJ's recollection of the brief exchange between Jaccard and Smith omits and misstates parts of Jaccard's testimony. The ALJ simply stated that Jaccard was working when Smith approached her, and they discussed her impending marriage before Smith noticed her union button. The ALJ failed to mention that it was near the end of Jaccard's shift when Smith approached Jaccard and started up a conversation with a simple "Hi" and "How are you doing?" He followed his greeting by asking

---

1. J.C. Penney argues that we should discount Jaccard's testimony because the ALJ rejected other testimony she gave concerning a different issue. J.C. Penney is mistaken. *See Kraushaar v. Flanigan*, 45 F.3d 1040, 1054 (7th Cir.1995) (stating that fact finder may believe some parts of a witness' testimony while rejecting other parts); *see also Rockwell Int'l Corp. v. NLRB*, 814 F.2d 1530, 1532 n. 2 (11th Cir.1987) (stating that ALJ is free to credit some portion of a witness' testimony without believing the witness' whole story).

Jaccard when she was getting married. The ALJ stated that Smith looked surprised that Jaccard was in favor of the union, but Jaccard's testimony does not mention that Smith was surprised. Her testimony only mentions that when Smith saw Jaccard's union button, his tone changed to that of disappointment. The ALJ also stated that Jaccard recalled that Wells looked sharply at Smith when she said, "Oh, you won't live long." Jaccard, however, testified that *Smith* looked sternly at *Wells* after she said, "Oh, you won't live long." Jaccard then stated that Smith's look toward Wells was disapproving of Wells' comment. Specifically she recalled, "And then Mark with a face on him like, 'Oh, she shouldn't have said that,' you know, and he turned around and walked away. He didn't say anything to Joanne." If anything, Jaccard's testimony suggests that *Wells'* comment was threatening, that Smith did not like the implications of Wells' comment, and that Smith walked away after Wells made her comment.[2] How "a face on him like, 'Oh, she shouldn't have said that,' you know" would appear baffles us. A frown? A leer? A blank stare?

▮▮▮▮▮▮ Whatever, the conclusory grounds stated by the Board are insufficient to support its order. We are aware that an ALJ's and the Board's findings are generally afforded great deference, but we cannot defer to something that is not based on facts-logical facts—in the record. That is, we can only defer to the ALJ's findings when the reasons for his decision build an accurate and logical bridge between the evidence and the result. Here, the bridge is out.

J.C. Penney also appeals the ALJ's findings that J.C. Penney discriminated against the union in three different instances. J.C. Penney contends that it had a valid, pre-existing policy prohibiting unapproved postings on company bulletin boards. J.C. Penney maintains that there was substantial evidence that the policy was consistently and uniformly enforced and that items that were not removed from the bulletin boards were connected "in large part" to company-sponsored events and charities. J.C. Penney also argues that there is not substantial evidence to support the Board's finding that the removal of a union sticker from an employee's work cart was a discriminatory application of J.C. Penney's practice on employee decoration of work carts. Finally, J.C. Penney believes that there was not substantial evidence to support the Board's conclusion that J.C. Penney violated the NLRA in answering an employee's question about posting union materials on easels. We find all of J.C. Penney's arguments unpersuasive.

Since 1977, J.C. Penney has had a bulletin board rule in its employee handbook, which reads:

> Bulletin boards are located throughout the Center [the CFC], generally near time clocks. Company announcements such as policy changes, holiday schedules and Company news of general interest are posted on these boards. Personal postings are not permitted.

The ALJ found that nonunion materials regularly appeared on some of the CFC's bulletin boards, including solicitations for the United Way and March of Dimes charities. Others were more personal, including thank you notes, party announcements, Christmas cards, solicitations for maid service, and collections for deaths and hospitalizations. The ALJ stated that testimony showed that at least some of these items were posted for a long period of time. Employees also offered personal items for sale in a company-approved publication.

Jeffrey Sembler, J.C. Penney's personnel manager, testified that J.C. Penney's posting policy did not permit the display of personal items, solicitations, or anything that did not have a direct effect on work. He stated that J.C. Penney did not permit the display of union materials because they were considered solicitations. Supervisors did remove

---

**2.** J.C. Penney argues that the Board should have drawn an adverse inference against the General Counsel for not calling Wells, who overheard the conversation, as a witness. But "[b]efore a party can argue to the trier of fact that an adverse inference should be drawn from another party's failure to call a witness, the complaining party must establish that the missing witness was peculiarly in the power of the other party to produce." *Oxman v. WLS–TV*, 12 F.3d 652, 661 (7th Cir.1993). Because Wells was a J.C. Penney employee whom either side could have called, J.C. Penney's argument fails.

union materials, and, in at least one instance, a supervisor removed a union posting and left a noncompany posting hanging intact. The ALJ found that "[w]hile the evidence shows that the Respondent has in some instances enforced its rule against unapproved postings this can best be described as spotty. Moreover, [t]he Respondent admits union postings would never be approved even though other personal postings do regularly appear on the boards."

■ An employer has the right to restrict access to its bulletin boards. *Guardian Indus. Corp. v. NLRB,* 49 F.3d 317, 318 (7th Cir.1995). An employer does not have to promote unions by giving them special access to bulletin boards, but, at the same time, it cannot discriminate against a union's organizational efforts, and thereby render those efforts "more costly than they would be if the employer left the employees to their own devices." *Id.* In *Guardian,* we found that an employer's permitting employees to post bulletin board notices advertising items for sale did not compel a finding that the employer was required to allow employees to post notices of union meetings. *Id. at* 321–22. Specifically, we reasoned that "[d]istinguishing between for-sale notices and announcements of all meetings, of all organizations, does not discriminate against the employees' right of self-organization." *Id.*

*Guardian* is analogous to our case except that in *Guardian,* the company did not allow *any* employee postings except "swap and shop" notices. In *Guardian,* the company allowed two wedding announcements and two notices about collections for sick employees some years before, but the Board did not argue that these kinds of notices were still being posted at the time the union organizational plan began. *Id. at* 319. In *Guardian,* this Court observed:

> Guardian Industries does not now, and apparently never did, allow general announcements of meetings. The Boy Scouts, the Kiwanis, the VFW, the Red Cross, the United Way, the employee credit union, local schools and churches—and meetings promoting and opposing unions—were and are uniformly excluded from its bulletin boards. We therefore must ask in what sense it might be discriminatory to distinguish between for-sale notes and meeting announcements.

*Id.* This Court concluded that "[a] rule banning all organizational notices (those of the Red Cross along with meetings pro and con unions) is impossible to understand as disparate treatment of unions." *Id. at* 320.

■ In this case, although J.C. Penney had a longstanding policy forbidding the posting of unapproved materials, its enforcement of that policy was inconsistent. J.C. Penney relies heavily on *Guardian,* but in *Guardian,* the company's policy was uniformly enforced, save for a few personal announcements which were posted long before a union campaign was in full swing. J.C. Penney argues that most of the postings it allowed were for company-sponsored events, but, in at least one instance, a supervisor had union materials removed while he left other nonwork-related materials intact. J.C. Penney's "spotty" enforcement was clearly the crux of the ALJ's finding of discrimination. We also note that, after his discussion of bulletin boards, the ALJ found that the company's enforcement of its policy prohibiting employees from affixing any materials onto employee lockers was not discriminatory because it was regularly enforced. Even the Board concedes that if J.C. Penney had uniformly enforced its property rights against other types of postings it would not have been discriminatory for it to have prohibited union postings as well. We agree with the ALJ that J.C. Penney's posting policy was disparately applied to union materials, in violation of § 8(a)(1) of the NLRA.

■ Concerning the decoration of employee work carts, the ALJ determined that J.C. Penney had established a permissive practice of allowing employees to decorate company-owned work carts with family pictures, stickers, and other memorabilia. The ALJ therefore concluded that J.C. Penney discriminatively modified an accepted practice when its operations manager, Tom Reichl, removed a union bumper sticker from an employee's work cart but left several nonunion stickers and family pictures undisturbed. We agree.

The policy for work carts is different from that for employee lockers, which the ALJ

found to be valid. J.C. Penney prohibited postings of any kind on lockers and that policy was regularly enforced. J.C. Penney's work cart practice is closer to its policy regarding bulletin boards, but even there J.C. Penney at least had a written, long-standing policy. The problem with the bulletin board policy was that it was selectively enforced. As to the work carts, however, the record reveals even though J.C. Penney owned the carts, it had a permissive, unwritten practice regarding their decoration. That once permissive practice changed abruptly and grew restrictive when union stickers were involved. It was therefore discriminatory.

J.C. Penney contends that the items remaining on Farris' cart were not similar in character to the union stickers which were removed because the remaining items were personal family pictures and stickers. However, in *NLRB v. Southwire*, 801 F.2d 1252 (11th Cir.1986), which we find most analogous to the work cart situation in this case, the Eleventh Circuit did not consider the character of the materials that remained after union stickers were removed. In *Southwire*, a Special Master found that in three separate incidents, an employee posted union stickers or literature on or in storage lockers which his employer furnished to him, and his supervisor either removed the stickers or ordered them removed. *Id. at* 1255. The Master found that the employer allowed the posting of other types of materials on lockers. *Id.* On appeal, the Eleventh Circuit determined that the Master's finding that the supervisor's actions were prompted by anti-union animus was sufficiently supported by the evidence that the employer permitted the posting of other types of material on the lockers. *Id.*

We defer to the ALJ's finding that J.C. Penney's sticker removal violated § 8(a)(1) of the NLRA. *Southwire* instructs that union stickers being singled out for removal is sufficient evidence of an anti-union animus. More importantly, in the case before us, the ALJ found that Reichl's removal of union

stickers and Sembler's affirmation of that action were discriminatory modifications of a once-permissive practice.

■ The ALJ also found a violation of § 8(a)(1) in J.C. Penney's communication of its policy regarding the posting of union-related materials on separate easels throughout the CFC. The ALJ found this violation in the posted minutes of a meeting between employees and management. The relevant portion of the minutes reads as follows:

> Q. Flyers were passed out this week concerning the union. Why did management pick them up? I was told it was against the law to pick them up.
>
> A. We have easels to display union material as well as our response. One of the main reasons that we went to displaying information both ours and theirs on easels was to minimize the miscellaneous papers being posted and left around.

The ALJ stated that J.C. Penney was free to display union materials and its response to those materials on easels. But the ALJ found that J.C. Penney's answer as to why union materials were picked up implied that it was because easels were available. The ALJ concluded that J.C. Penney's statement left the incorrect impression that easels were the only proper means of circulating materials and that J.C. Penney therefore was in violation of § 8(a)(1).

J.C. Penney wonders how this remark can be a violation of § 8(a)(1) when it is in reference to a separate cafeteria incident in which the ALJ found no violation of the Act.[3] However, J.C. Penney's answer went beyond its employee's question. While the employee's question only concerned the removal of flyers from unoccupied cafeteria tables, management responded that easels were used to minimize miscellaneous papers being *posted* and left lying around. We can therefore see why the ALJ, having found that J.C. Penney had unlawfully removed union materials from bulletin boards, could have determined that management's remark violated § 8(a)(1)—it

**3.** On November 2, 1995, union handouts were placed on unoccupied tables in J.C. Penney's cafeteria. Two supervisors promptly removed these materials. The ALJ found that it was common for supervisors and cleaning personnel to throw away *any* items (whether they be union notices, catalogs, or newspapers) remaining on the tables after the employees left the cafeteria. The ALJ therefore found no violation in this practice.

gave the impression that easels are the only proper means of circulating union material. Given the breadth of management's response, the ALJ's finding was supported by substantial evidence.

## Conclusion

We deny enforcement of that part of the Board's order that J.C. Penney cease and desist from threatening employees with the loss of employment because of union sympathies. We enforce the remainder of the Board's order.

CUDAHY, Circuit Judge, concurring in part and dissenting in part.

The majority recites the proper incantation of deference to the NLRB, but does not live by that time-honored maxim. The ALJ found that Mark Smith threatened Diana Jaccard when he saw Jaccard's pro-union pin and said, "I'm glad you got a husband." It is possible that Smith meant no harm. Perhaps after noting Jaccard's pro-union pin he shrugged, paused and tried to return to the topic of Jaccard's impending wedding. But it's also possible that Smith looked, sounded and was menacing.

It is a question of tone and of temperament, and of whom you believe. The ALJ heard Jaccard and Smith; this court has not. And the ALJ believed Jaccard and not Smith, who flatly denied that the conversation ever took place. The credibility of a witness—and our deference to the ALJ—goes beyond the bare fact that words were spoken. *Canteen Corp. v. NLRB,* 103 F.3d 1355, 1363 (7th Cir.1997). A witness' credibility also can inform a factfinder's understanding of what those words meant. See *NLRB v. Champion Laboratories, Inc.,* 99 F.3d 223, 231 (7th Cir.1996) (Ripple, J., concurring in part and dissenting in part) (for assessing whether employer threatened employee, ALJ's impression of demeanor is pivotal). The majority does not heed its own resolution to weigh heavily the judgment of the judge on the scene, and instead substitutes its own. This is not the role Congress committed to us. *Id.*

I therefore respectfully dissent with respect to this issue and would enforce the NLRB's order in full.